JOSEFINA AMY-RAMÚ ET AL., Plaintiff-Appellants, *v.* HEIRS OF EUGENIO M. VERGES, Defendant-Appellants.

No. 3712. Argued March 24, 1926.—Decided July 6, 1927.

*Jacinto Texidor* for the plaintiff-appellants. *Tomás Bernardini de la Huerta* for the defendant-appellants.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

Defendants, heirs of Eugenio Marcelino Verges, appeal from a judgment for the recovery of two certain parcels of real estate, one known as "Adela" and both situated in the

ward of Jobos, of Guayama, sold in 1895 to Eugenio Marcelino Verges by Enrique Amy Pareñó as the legal representative of his minor children now plaintiffs herein, pursuant to two separate orders entered by a competent court, at the instance of said Amy Pareño, authorizing such transfer; and for costs.

Plaintiffs also appeal from the same judgment in so far as a pronouncement refusing to allow a claim for rents and profits is concerned.

The complaint is a formidable document. We take therefrom the following extract:

"Plaintiffs allege that Enrique Amy, not having paid Eugenio Marcelino Verges the amount for which the security mentioned in the preceding averment was given, both agreed, in the interest of their business, to substitute other properties for said security; Enrique Amy not having any property of his own that would suit his creditor, they both agreed, with complete knowledge as to the character and quality of the new security, that it would be constituted by the two properties already described in the third averment of this complaint, which properties at that time, that is, in the year 1895, already belonged to plaintiffs herein, who had inherited them from their mother, Carlota Ramú, former wife of Enrique Amy. And, pursuant to the terms of such agreement, Enrique Amy Pareñó appeared, as father of plaintiffs herein, before the competent court and filed a petition for judicial authorization to sell the two properties above mentioned, for reasons of utility and of necessity for the minors, said petition being based on facts different from the agreement with Eugenio Marcelino Verges, and said authorization being obtained for such reasons. Enrique Amy and Eugenio Marcelino Verges, having knowledge of these facts, executed a deed on March 11, 1895, whereby it was made to appear that Enrique Amy was selling to Eugenio Marcelino Verges, for value received, the two properties described in the third averment of this complaint. But plaintiffs allege that immediately after the execution of said instrument Amy and Verges signed another document of a private character setting forth the true agreement which had been made between them, and stating the fact alleged by plaintiffs herein that in the said simulated sale there was no consideration, nor was there

any delivery thereof, but only a security for the payment of 6,667 *pesos* and 80 cents which Amy owed Verges.''

Plaintiffs also expressly alleged that the possession of the said property by Verges was never that of an owner and that he never intended to acquire it for himself, but remained in possession thereof until the time of his death and that defendants had continued thereafter in such possession; that plaintiffs had never at any time ratified, or consented to, the sale or transfer of the said property and had never received the price of the said sale nor any part thereof.

In *Amy* v. *Verges*, 33 P.R.R. 359, these and other averments there outlined were somewhat liberally construed and accepted at their face value in order to sustain this pleading as stating sufficient facts to constitute a cause of action, when challenged by a demurrer. The case developed by the evidence adduced at the trial, however, reveals a situation quite different in its essential details from that indicated by the complaint.

The two orders authorizing the sale of the two properties in question were entered in two separate proceedings. The original record of one of these proceedings, and, apparently, the one first instituted, seems to have been lost. The record before us contains no copy of the petition for judicial authorization first filed, and there is nothing whatever in the order subsequently issued in accordance with the prayer of that petition to indicate that the same or the testimony of the witnesses presented in support thereof concealed from the court or failed to disclose, or in any way misrepresented the true character of the relations existing between Amy and Verges or of the proposed transaction already agreed upon by them.

The petition in the second proceeding, as far as pertinent, and the two orders in question are set forth in the Spanish edition at page 961 of Vol. 37 D.P.R.

The only evidence upon which plaintiffs rest their claim

as to a simulated sale and actual substitution of the property belonging to them as security for the payment of indebtedness previously secured by a like conveyance of other property belonging to Amy consists of two private documents, one suscribed by Eugenio Marcelino Verges in 1886 and another by both Verges and Amy at the time of the so-called simulated sale of plaintiffs' property, both of which documents are set forth in full in *Amy* v. *Amy*, 15 P.R.R. 387, and need not be recopied here. There is nothing whatever in either of these writings to support the theory of a substituted security or a simulated sale or a fraud upon the court or a failure to comply substantially with the terms and conditions of the orders authorizing the sale.

In the case last above mentioned, referring to these documents and quoting with approval from the opinion of the district judge, this court said:

"The evidence presented in support of said simulation are some private documents, executed at such·dates, and the depositions of several witnesses, among whom those of Messrs. Verges and Amy, purporting to show that said estate was always in possession of Mr. Amy, the defendant. ·These private documents do not deny, either in their letter or spirit, the existence and reality of the transfers made by deed and only make clear what refers to price and value assigned to said property; but even conceding to this evidence and the statements of the witnesses all the probatory force given them by the plaintiffs, we would reach the conclusion that said contracts have other valuable and sufficient consideration for their support according to the proof itself and therefore said deeds of transfer do not suffer from the alleged ground of nullity, according to article 1243 of the Civil Code (1276 of the old); according to what has been decided by the Supreme Court of Spain in construing this section, in its judgment of the 14th of March, 1891, wherein it is stated:

"'The mere fact of the expression of an inaccurate and false consideration made by the parties upon the execution of the contract does not invalidate the same, whenever it appears to have been based on another, which, although different from the one expressed may be actual and lawful; for in such case the lack of consideration being

only apparent, the obligations contracted by the interested parties with full knowledge may be valid.' ''

The conveyance primarily under consideration at that time was the transfer in 1886 by Amy to Verges of the property later known as "Trinidad" and reconveyed by Verges to Amy in 1895 contemporaneously with the sale of the property now sought to be recovered by plaintiffs. But what was said at that time and with reference to that transaction applies with equal if not greater force to the subsequent sale now under consideration.

And upon the same aspect of the earlier case, this court, at page 408, said:

"With respect to the action for revindication we agree with the trial court that no fraud was shown either in the deed from Amy to Verges or from Verges to Amy. The fact that the consideration was incorrectly stated makes no difference as there was a valuable consideration for the transfer consisting in the debt which Amy owed Verges. Mrs. Carlota Ramú joined in the deed and we do not see how her heirs can be heard to assert that a fraudulent act on her part can redound to their advantage. Amy who was a witness of the complainants himself testified that when the conveyance was made to him from Verges he thought he would be able to arrange everything with his creditors (statement p. 29), and it is idle for appellees to suggest that he was attempting to defraud his own children. There is no evidence of fraud in this case. Everyone was apparently acting in good faith."

Now, as at the time of our decision in *Amy* v. *Amy, supra,* "the fact that the consideration was incorrectly stated makes no difference." We need not go so far as to insist now, although we would be equally justified to say the least in asserting, with reference to Amy Pareñó that "it is idle for appellees to suggest that he was attempting to defraud his own children." But the statement last quoted voices what in all human probability would have been the mental attitude of the judge of first instance in Guayama toward such a

suggestion, had it been made during the course of the proceeding instituted by Amy Pareñó in 1893.

Obviously, Verges regarded the conveyance of 1886 as a mere security for the debt of Amy Pareñó, and intended to treat the deed as a mortgage, whatever the understanding or agreement of the parties may have been at the time upon this point. It is equally clear that no money changed hands in 1895, but it does not follow that the conveyance of the property belonging to plaintiffs in March of the year last mentioned was either a mere substitution of security for a preexisting debt or without a good and sufficient consideration flowing from Verges directly or indirectly to plaintiffs. Nor does the memorandum subscribed by Verges and Amy on the date of the double conveyance lend any additional strength to plaintiff's theory of the transaction. That document does not mention or suggest a substitution of securities, but speaks in plain terms of a friendly adjustment or settlement of Amy's indebtedness to Verges. The consideration for the release and transfer by Verges of the property in Aguamanil known as "Trinidad" was the absolute conveyance to him of the property in Jobos belonging to plaintiffs, in payment and satisfaction of the Amy debt. The consideration for the alienation of the property belonging to plaintiffs was the conveyance by Verges to Amy Pareñó of the property known as "Trinidad," a coffee plantation many times larger in area, more conveniently located, and of much greater value than the two parcels acquired by Verges, and as far as the minors were concerned the presumptive benefit and advantage accruing to them from the transaction as a whole, including, if not an expectancy in the property so acquired by the father, at least an obligation assumed by him to reimburse them upon becoming of age in a sum equivalent to the total amount of his previous indebtedness to Verges, and representing twice the value of the Jobos property, together with the promise

and apparently increased ability of Amy Pareñó to furnish proper security for the fulfilment of this obligation. The net result would have been exactly the same if Verges had paid Amy six thousand six hundred and sixty-seven *pesos* and eighty-six cents in cash in the presence of a notary, upon signature of the deed to the Jobos property; and if Amy had immediately returned to Verges, likewise in the presence of the notary, the identical bills or coin in question upon signature of the second deed as the actual consideration for the release and transfer of the coffee plantation.

Any possible doubt as to what actually occurred and as to the true purpose and intention of the parties is removed by the existence of two entries in the handwriting of Verges and made by him in his books at the time of the transaction last above mentioned. These two entries are as follows:

"March 12. By friendly arrangement entered into with Enrique Amy, according to which I return to him the 'Trinidad' property, of Guamaní, and receive in payment 86.56 acres (*cuerdas*) of grazing lands, belonging to his children, Amy Ramú, out of the 'Adela' property (Jobos) property for property, without a penny in cash having passed between us. The debt is one of $6,667.86 outstanding in my books against the 'Trinidad' property, and I have never charged him any interest, in consideration of his situation and for the benefit of his other children by Tututa. The titles to the properties have been conveyed today before notary José Mariano Capó, the Trinidad appearing (conventionally) at $30,000, and the Jobos at $3,200. This is done in order to comply with the revenue law, but the transaction was made as I have stated and as it appears from a private instrument signed today by Amy and myself.

"I deliver the Trinidad property, of course, but the Jobos property is encumbered by a contract with Amorós Brothers, which expires in 1900 and which I bind myself to observe in consideration of the payment of $266.71 yearly, beginning with the first instalment of 1894 (our agreement dating from 1893), and representing an interest of four per cent per annum on the debt of $6,667.86 for the time that I may be deprived of the possession of the Adela property.

"March 12, 1895. Enrique Amy to Estancia Trinidad. For the

transfer of said property by public deed, all expenses for execution, etc., included, to be charged to the account of Amy, $6,667.86.

Sundries to Enrique Amy—Real Property.—By purchase from Enrique Amy of 43.29 acres of land in the Adela plantation, situated in the ward of Jobos, Guayama, awarded to Tututa in the partition of the estate of her grandfather Simón Moret, $1600. Id. by a like parcel from Enrique Amy himself, awarded in the same manner to Luis Ramú, and purchased by Amy with money obtained from a life insurance policy of Tututa, $1600.

"E. M. Verges, Capital Account. By a rebate in estimate which I make in the account of Amy by virtue of this transaction, this sacrifice being made for the benefit of the minor children of Tututa, for which their father should provide security on the coffee plantation in Guamaní, $3,467.86. Total, $6,667.86."

The judicial authorization for the alienation of plaintiffs' property contemplated the investment of the proceeds of such sale in the acquisition of a larger and more valuable tract adjacent to properties already owned by Amy Pareñó in Aguamanil. The exchange of properties effected on March 12, 1895, was a substantial compliance with the terms and conditions of the orders in question as far as Verges was concerned, unless the two orders containing such authorization can and should be so construed as to require a conveyance directly to the minors or to Amy Pareñó as their legal representative and expressly in trust for them, and as imposing upon Verges the duty and obligation of executing a deed in such form, or of insisting upon the creation and constitution in the same instrument of a first mortgage by Amy Pareñó upon the property in question in favor of his minor children and by way of security for the protection of their interests. In the absence of any express provision to this effect in either of the orders referred to or any clear intimation of such purpose or intention on the part of the court issuing such orders, it would seem hardly reasonable to demand of Verges a strict compliance with terms and provisions, for the protection of the minors in question, which might have been suggested by the *Fiscal* or included by the

court in its orders without the need of such recommendation, but which were never in fact so suggested or included, nor apparently at any time in the mind of any of the parties concerned.

In our consideration of this matter, we must not lose sight either of the substantive law or of the Code of Civil Procedure in force at the time of the events in question.

It may be noted in passing, however, that even under the more elastic rules of equity practice in the Federal and State Courts, "the purchaser is not as a rule under any duty to see to the application of the proceeds of sale." 31 C. J. 1056, par. 141, *Knotts et al.* v. *Stearns et al.*, 91 U. S. 638.

Again: "Where the court had jurisdiction to order the sale, and the proceedings in regard to the sale are regular on their face, and one purchases the property in good faith, for a valuable consideration, and without knowledge, either actual or constructive, of any defect or irregularity that makes the sale at most voidable, his title will be protected; and under this rule a purchaser may not be ousted because of fraud of the guardian inducing the sale where he did not participate in, or have knowledge of, such fraud." 28 C. J. 1201, par. 351.

And, although the purchaser can not escape the doctrine of *caveat emptor,* in circumstances justifying an application thereof, "he is not bound, however, to inquire into irregularities which do not appear of record; and is not required to look back of the judgment or order recognizing the necessity for the sale." Id. 1202.

Also: "Unless required by statute it is not necessary to the validity of the sale that the guardian make a report or return thereof to the court." Id. 1189, par. 329.

Not only must the facts in the instant case be regarded from the standpoint of the former Civil Code and Code of Civil Procedure, but, in order to get that viewpoint and incidentally the only true or proper perspective, both codes

must be construed in the light of their history and high regard for the sanctity of the *patria potestas* and for the presumptive purity of motive underlying and governing the exercise of that power.

Articles 164 of the Civil Code and 2014, 2022 and 2023 of the Code of Civil Procedure in force in this Island prior to 1904 read thus:

"Art. 164. The father, or the mother in a proper case, can not alienate the real property of the child, the usufruct or administration of which belongs to them, nor encumber the same, except for sufficient reasons of utility or necessity, and after authorization from the judge of the domicile, hearing the department of public prosecution, excepting the provisions which, with regard to the effects of transfers, the mortgage law established."

"Art. 2014. The authority shall be granted in all cases under the condition that the sale must be made at public auction, after an appraisement, if property mentioned in numbers 1, 3, or 4 of article 2010 is involved.

"Sales made by the father, or mother, in a proper case, exercising parental authority, are excepted from the foregoing rule. Such sales may be made without any other requisite than that of having first obtained judicial authority with a hearing of the *promotor fiscal* and of the persons mentioned in articles 219 and 213 of the mortgage laws respectively in force in the islands of Cuba and Porto Rico. .

"Art. 2022. After the sale is made the judge shall, under his liability, see that the amount received at said sale be applied as stated in the petition for authorization to make the sale.

"Art. 2023. The amount received shall be delivered to the tutor or curator, pending its application, if he has been exempted from furnishing bond or if he has furnished bond sufficient to secure the same. Otherwise it shall be deposited in the public establishment in which judicial deposits are made."

After pointing out the intimate relationship between the corresponding articles of the Spanish Code of Civil Procedure, article 164 of the Spanish Civil Code and 205 of the Mortgage Law, Manresa in his commentary on the Code of Civil Procedure, at page 465 of vol. 6, says (Italics ours):

"By virtue of all these provisions, the father or. mother with

patria potesta's may alienate or encumber said property of the children *with no other requisite* than the judicial authorization of the judge of first instance of the domicile, after a showing before the same judge as to the necessity or utility of the transaction, with the intervention of the prosecuting attorney.''

Scaevola, in discussing the remedies available and unavailable to minors whose rights or interests have been prejudiced through the wrongful exercise of parental authority under the restriction imposed by section 164 of the Civil Code, at page 319, vol. 3 of his commentaries, makes the following interesting comparison:

''Section 1296 say's that 'the rescission referred to in number 2 of section 1291 (contracts executed in representation of absentees) *shall not take place in contracts executed with judicial authorization.* The legislator has thought, not incorrectly, that this requisite is enough to remove the possibility of lesion in a contract and for that reason the rescission is not allowed in such a case. Now, if this be true in case of absentees, with greater reason it should be so in case of children, inasmuch as the contract is executed by the father or the mother who must be deemed to have the highest degree of affection. This is supported by another consideration, that is, that if the sale or encumbrance is executed without judicial authorization, the contract would be void, by virtue of the provisions of the first paragraph of section 4 of the Code.''

And further, as to the state of the law before and after the enactment of section 164, viewed from the standpoint of the remedy, at page 321, we find the following:

''The foregoing shows the radical difference regarding the rights of children, in case of a sale of real property by the father, that exists between the silence of the code and the conclusive doctrine of Law No. 24, Tit. 13, 5th Partida, affirmed by judgments of January 16, 1862, December 30, 1864, February 1st, 1867, April 20, 1870, and May 18, 1878. By the mere fact of the sale, the property of the father was obligated and encumbered in favor of the children. In case such property was not sufficient, then the children could claim any property 'sold by the father wherever found. The same thing is said in two more recent decisions, those of April 12, and November 30, 1866, from which we quote the following: 'The alien-

ations, made by the father, of property belonging to the children,'—
the first one says,—'are annulled and a revendicatory action lies,
according to Law No. 24, Tit. 13, 5th Partida, only in case the
children can not be compensated with the property of the father
and if they do not want to inherit from him.' The laws regarding
the sale of property belonging to minors, who are not subject to
*patria potestas* but to a guardian, are not applicable to this case.

"The second decision states that 'according to Law No. 24, Tit.
XIII, 5th Partida, the father who alienates property belonging to
his children, who inherited it from their mother, is liable with his
own property *until they receive from him an equivalent of what he
has alienated,* and, in case of insolvency of the father, the *children
may claim the property from whoever has it, provided the children
do not care to inherit or participate in the property of the father.*
Whatever may be the rules of today governing the alienation of real
property of minors under the *patria potestas,* the fact remains that
at the time when the contract relating to the property in question
was made, the father was authorized to sell the real property of
the *peculium adventitium* of the son without judicial authorization.
The insolvency of the father at the time of his death, and the fact
that his son was not his heir give rise to the action, provided by
law in favor of the son, *to claim his property from whoever may have
it.* It is no obstacle to this action that the sale was made with
judicial authorization, or that a mortgage was constituted in favor
of the minors in order to secure the investment of the proceeds, in-
asmuch as neither of these things was necessary in such a case, and
it must be further taken into consideration that this last feature
was established for the benefit of the purchaser.' The difference, as
we have indicated, is most radical and less favorable to the children."

Manresa begins his commentary upon article 164, 2 Com-
mentaries on the Civil Code (Second Edition), 41, with this
statement:

"Our old law is doubtful and vacillant, and so, therefore, is the
jurisprudence construing it, with regard to the question whether or
not judicial authorization is necessary for the parents in order to
alienate or encumber the property of their children. Thus, we find
it plainly established by the Fuero Juzgo that the father *must have
his buena from his children, but he can not sell or alienate their prop-
erty.* The Partidas also follow the doctrine that *although said
property should belong to the father and he may receive the products*

*therefrom, he can not alienate said property by any means;* but it further adds: 'and if perchance he alienate it.' The construction of this phrase gives rise to the diversity of opinion above referred to.

"In the foreign legislation the construction of some of the codes offers no lesser doubt. Two opposite opinions are maintained, for instance, about the French Code, by Demolonbe and Laurent, the former asserting that judicial authorization is required by statute, and the latter that such authorization is not within the contemplation of the law.

"As to our code, there can be no doubt that judicial authorization is necessary in order to alienate or encumber such real property."

The question as to whether or not the contract executed by a parent under an order issued by a competent court may be regarded as voidable in any event at the instance of the minor child or children upon attaining majority is, in the opinion of Scaevola, plainly debatable. Scaevola and Manresa are agreed that such a contract can not be rescinded. Scaevola insists that an action for damages does not lie. Manresa takes issue upon this point. Commentaries on the Civil Code (Second Edition), page 47.

That the effect of a judicial authorization once obtained, regardless of the means employed or the circumstances involved, was to protect the purchaser and to place the minor at a disadvantage is clearly the conclusion reached by Scaevola. The soundness of that conclusion may or may not be open to challenge. A more significant and more unquestionable proposition plainly deducible from the general tenor and effect of the views expressed by both commentators is that article 164 of the Civil Code placed a definite and unmistakable limitation and restriction upon the exercise of the traditional *patria potestas.* The extent and effect of this statutory invasion of parental power and authority must be measured by the scope and meaning of the statutory requirement construed in connection with other provisions *in pari materia.*

Another long stride in the same direction, although of course not retroactive in its results, was taken by our Insular Legislature in section 229 of the Revised Civil Code, as amended in 1911, which now reads in part as follows:

"The exercise of the 'patria potestas' does not authorize the father nor the mother to alienate or lay any encumbrance upon real property of any class whatever or upon personal property, the value of which exceeds five hundred dollars, pertaining to the child and which may be under the administration of its parents without the previous authorization of the district. court wherein the property is situate and the demonstration of the necessity and utility of the alienation or encumbrance and in conformity with the provisions of sections 80, 81, and 82 of an act relative to special legal proceedings."

Section 82 of the Law of Special Proceedings provides that—

"Whenever the judge should authorize the petitioner to execute any act or contract whereby the minor or incapacitated person is to receive money or any other values, the decision shall determine the manner in which the placing or investment of the thing acquired shall be made and it shall be the duty of the district attorney to see, as he may deem best, that the judicial decision be complied with.

"The public sale of property belonging to a minor or incapacitated person shall be carried out in the presence of the marshal of the district after the publication of the corresponding edicts.

    *        *        *        *        *        *        *

"Any violation of the order dictated by the judge shall be punished as 'contempt of court', without prejudice to the responsibility, either criminal or civil the violator may incur in."

The elaborate provisions of sections 80 and 81 are omitted here in the interest of brevity.

The obvious purpose of these more recent enactments was not merely to re-establish the rules prescribed by the laws in force at the time of the adoption of our present Code of Civil Procedure and to supply omissions therein, but also to provide additional protection for the rights of minors by

conferring upon the court and upon the district attorney powers that they did not have, and by imposing upon them duties and responsibilities that did not exist under the Spanish Civil Code and system of procedure. Otherwise, there was no need and no satisfactory explanation could be given for the modification made in those laws, and the fact of such modification is self-evident.

The effect of these changes, in so far as the control of the court over the exercise of the *patria potestas* is concerned, has been to reduce the parental authority to the same general level as that of a tutor or guardian.

Nevertheless, this court in a recent case, *Fuentes* v. *Registrar,* 24 P.R.R. 579, speaking through its former Chief Justice, was unanimous upon the point involved in the following statement:

"Section 82 of the act relating to special legal proceedings, as amended by Act No. 33 of March 9, 1911, provides that whenever the judge authorizes the representative of the minor to execute any act or contract whereby the minor is to receive money or any other values, the decision shall determine the manner in which the placing or investment of the thing acquired shall be made; and it shall be the duty of the district attorney to see, as he may deem best, that the judicial decision be complied with. In accordance with this provision Gabriel C. Fuentes will be required to justify the investment of the $900 which he received as the proceeds of the sale of the joint interests owned by his children in the house sold at auction by the marshal of the District Court of Humacao; but the district attorney and not the registrar of Caguas is the proper person to demand such justification."

The Registry of Property is an institution for the protection of third persons.

It is the plain duty of the registrar to refuse to record any instrument that is fatally defective and to point out the existence of any curable defects that can be found in documents that are otherwise eligible to record. He is liable upon his official bond for any omission or neglect of that duty. To say that he may not question a deed of conveyance

executed under the authority of a judicial authorization for the alienation of property belonging to minors, for want of any showing as to the application made of the proceeds from the sale so authorized, means, if it means anything at all, that a failure on the part of the parent or guardian to reinvest the purchase money as required by the order authorizing the sale can not affect the title of the purchaser who had parted with his money upon receiving a deed to the property in question.

*A fortiori,* in 1895, in the absence of any such statutory requirement and in the absence of any specific provision in the order authorizing a sale or alienation of real estate, the responsibility for a proper performance of an implied duty upon the part of a parent in connection with a contemplated re-investment of proceeds or the execution of a mortgage or the giving of other security for the protection of minor children could hardly be said to rest upon the shoulders of a purchaser of the real estate so alienated or upon those of a vendor of property conveyed to the parent of such minors with a view to the subsequent encumbrance thereof for their benefit and advantage.

The entire history of the instant case, from and after the date of Amy's second marriage in 1893, points to that event as a prime factor in the situation existing at the time of obtaining judicial authorization for the sale of the two properties belonging to the children of petitioner, issue of the first marriage.

One of those properties had been purchased with the proceeds of a life insurance policy after the death of the first wife. The title to the other parcel, the alienation of which was first authorized, had been derived directly by inheritance. In the complaint herein, as in previous suits, both properties are alleged by plaintiffs to have been acquired by inheritance and are uniformly so treated and repeatedly

so referred to by counsel for appellees from beginning to end of the brief.

The order first obtained authorized the sale of the property belonging to the children of a first marriage and acquired by them by inheritance from their deceased mother. The petition for the second order was presented by Amy as a married man and as the father of the minor children in question born of a former marriage. The prayer was for an order authorizing the sale of a second parcel of land belonging to the said minors, as an incident to the transfer already authorized and as a part of the same transaction. In the circumstances we need not stop at this stage of the proceedings to quibble about the exact technical status of property purchased with the proceeds of a life insurance policy in favor of the surviving spouse and children of a deceased wife and mother.

The phraseology of the two orders and of the only petition before us must be construed in connection with the facts that appear upon the face of those documents, supplemented, if need be, by any others, that may fairly be presumed to have been uppermost in the minds of petitioner, *fiscal* and judge, and in the light of the law applicable to such facts.

By the terms of article 160 of the former Civil Code the parent who has the custody and control of a minor is the usufructuary as well as the administrator of all adventitious or gratuitously acquired property belonging to such minor.

Articles 163, 491 in part and 492 read as follows:

"Art. 163. The parents have, with regard to the property of the children, the usufruct or administration of which belongs to them, the obligations of every usufructuary or administrator and the special obligations established by section 3, title 5, of the mortgage law.

"An inventory shall be made with the intervention of the department of public prosecution of the property of the children in which the parents have the administration only, and on the recom-

mendation of the said department the judge may decree the deposit in public securities of the property belonging to the child.''

''Art. 491. The usufructuary, before entering upon the enjoyment of the property, is obliged—

\*　　\*　　\*　　\*　　\*　　\*　　\*

''2. To give security, binding himself to comply with the obligations imposed on him by this section.

''Art. 492. The provision contained in number 2 of the foregoing article is not applicable to the vendor or donor who has reserved to himself the usufruct of the property sold or bestowed as a gift, nor to parents who are the usufructuaries of the property of their children nor to the surviving spouse with regard to the hereditary portion granted to him or her by articles 834, 836 and 837, except in case the parents or spouse contract a second marriage.''

Articles 157, 168 in part, and 200 to 206, inclusive, of the Mortgage Law are as follows:

''Art. 157. Statutory mortgages are those only which are defined in article 168.''

''Art. 168. A statutory mortgage is established:

\*　　\*　　\*　　\*　　\*　　\*　　\*

''2. In favor of the relatives referred to in article 811 of the Civil Code, for the property which in accordance with that article must be set apart, on the property of the person obliged to set it apart; and in favor of children on the property of their parents, for the property which the latter must set apart for them under the law, and for the property belonging to such children while under the *patria potestas* of the father or mother, in the event of the latter contracting a second marriage.

''3. In favor of the heirs of the deceased spouse, on the property of the surviving spouse for the hereditary share to the usufruct of which the latter is entitled under the law in the event that specific property passes into his or her hands for this purpose, provided he or she shall contract a second marriage.''

''Art. 200. The father, or, in his absence, the mother, is the legal administrator of the property of the children under his or her power, although under the obligation of creating a statutory mortgage in favor of the latter, if he or she should contract a second marriage.

"Art. 201. The children in whose favor a statutory mortgage is established by the preceding article, shall have the right:

"1. To have the real property belonging to them recorded in their names, if not already so recorded.

"2. To have their father, or, in a proper case, their mother, secure by means of a special mortgage, if they can do so, all property other than real property belonging to said children.

"Art. 202. It shall be understood that the father or, in a proper case, the mother, is not able to create the mortgage referred to in the preceding article, if they do not own any mortgageable real property.

"Art. 203. If the real property owned by the parents should be insufficient, they shall, nevertheless, constitute the mortgage thereon, without prejudice to extending it to cover property which they may acquire later, should they be required so to do.

"Art. 204. The following persons may demand the enforcement of the rights mentioned in article 201, on behalf of the children.

"1. The persons from whom the property is derived.

"2. The heirs or executors of such persons.

"3. The ascendants of the minors.

"Art. 205. The father or, in a proper case, the mother, can not alienate the real property belonging to a child of which they enjoy the usufruct or administration, nor encumber it, except for established causes of utility or necessity, and with the authorization of the judge of the domicile, granted after hearing the representative of the department of public prosecution.

"Art. 206. In the event that the persons mentioned in article 204 should fail to demand the enforcement of the rights mentioned in article 201, the fiscal may do so on his own motion."

After the death of the first wife, unless and until the surviving spouse should contract a second marriage, he was under no legal obligation to furnish security for the proper management, care, and administration of property belonging to his minor children, but in his custody and under his control as administrator and usufructuary. The only property owned by Amy Pareñó at the time of his second marriage consisted apparently of five or six small parcels of land in Aguamanil amounting in the aggregate to an area approximately the same as that of the two properties belonging to

his minor children in Jobos. Whatever paraphernal property of the first wife, if any at all had ever been delivered to him, seems to have been already lost. Referring to a somewhat similar situation the Supreme Court of Louisiana in *Cleveland* v. *Sprowl,* 12 Rob. 172, said:

"It may be a hard case; and we should perhaps, as men, be disposed to sympathize with the feelings expressed by one of the appellant's counsel in his brief, and deplore the situation of a poor orphan, whose estate has been squandered by his father, and who is left remediless after the latter's death. But such is the law. As Judges we are bound to obey it; and we do not feel authorized 'to strain it a little,' as the counsel suggests, even were it for the sake of remedial justice."

See also *Handy* v. *Parkison,* 10 La. 92, and *State of Louisiana* v. *The Judge of the Parish of Orleans,* 6 La. 363.

The judge of first instance knew that Amy Pareñó, as administrator and usufructuary of the proceeds derived from the sale of the Jobos property, would be subject to no restriction or control in the use or disposition to be made thereof beyond the obligation imposed upon him by law to execute a mortgage in favor of his children upon the real estate then owned or subsequently acquired by him. The court knew that this obligation if not voluntarily performed could be enforced or presumably would be enforced, if at all, only by the executor of the deceased wife or by certain specified relatives or else as a last resort, and upon failure of any of these to act, by such steps as the *fiscal* might be constrained to take.

Perhaps the execution of a mortgage upon the real estate already owned by petitioner might have been made a prerequisite to the conveyance of the property in question. Possibly some provision might have been made for judicial custody of the proceeds pending re-investment thereof. But it is doubtful, to say the least, whether any precedent can be found in the annals of Spanish jurisprudence for such precautionary measures in a case of this kind. Certainly

there is not the remotest suggestion of any such condition precedent anywhere in the proceedings which culminated in the sale of the land now in controversy. It did not even occur to the Guayama court to require the execution of a mortgage upon the property about to be acquired by Amy at the time of such acquisition or for that matter thereafter. The judge, imbued with the spirit of the various codes in force at the time and reposing full faith and confidence in the paternal conscience and in the natural love and affection of a father for his children, left the performance of the duties and obligations imposed by law upon Amy Pareñó entirely to him under the general provisions of that law. In such circumstances to say that the conveyance to Verges had not even the semblance of a contract sufficient to set in motion the four years' statute of limitation would involve a unique extension as well as a drastic application of the rule *caveat emptor.*

There was, of course, an implied understanding that Amy Pareñó would acquire a larger and more valuable property adjoining those already owned by him in Aguamanil and ''in that manner'' or, at most and in addition to such acquisition, would proceed in the usual way, that is to say, in the manner prescribed by law, ''to provide security for what belonged exclusively to his said children with much greater value and increase than that of the properties about to be sold.'' But no inkling of a purpose to require even such security can be found in the dispositive portion of either of the orders in question. The authorization for a sale of the property now sought to be recovered was unconditional and unqualified.

That this was the understanding of all parties concerned at the time and for many years thereafter is conclusively shown by the stipulation contained in the private document of even date with the two deeds executed in 1895,—by the mention of an obligation in this regard as resting upon Amy, in the journal entry made by Verges,—by the subsequent

execution of mortgages in favor of the minor children, now plaintiffs herein, upon all the properties owned by Amy Pareñó, including that conveyed to him by Verges, by the acceptance on the part of plaintiffs of money paid to them in satisfaction and discharge of one or more of such mortgages, by the acceptance on the part of plaintiffs of a conveyance of a number of the smaller properties owned by Amy Pareñó in payment and satisfaction of the obligation for the security of which such mortgages were constituted, and by the theory of the two actions first brought against Amy Pareñó and Mateo Amorós, in both of which plaintiffs sought to establish the superiority of the second mortgage constituted in their favor by Amy Pareñó upon the property acquired from Verges over a previous lien of like character likewise created by Amy Pareñó in favor of Amorós Brothers.

We do not deem it necessary at this time to discuss the doctrine of election of remedies or to elaborate in detail the circumstances tending to establish the theory of ratification set up by defendants as a special defense. It would suffice to say that the question of ratification *vel non* does not depend upon the amount of money or land received and accepted by plaintiffs and that the doctrine of application of payments is not involved or, if involved at all, is not a controlling factor in the circumstances of this case.

The Jobos property was worth approximately 3,000 *pesos* in the circulating medium in use at the time of the sale. No interest accrued on this sum during the minority of plaintiffs. The five properties conveyed to plaintiffs by Amy Pareñó in 1906 were valued by mutual agreement at $2,500, and were accepted at their appraised value in part payment or reimbursement of a specified portion of the inheritance which seems to be fairly well identified as the item represented in part by the "Adela" property. Upon cancellation of the mortgage on a parcel of 50 *cuerdas* which had passed into other hands, plaintiffs in 1910 acknowledge that they had

received from Amy Pareñó prior to that date the sum of $1,500, that being the amount secured by the said mortgage. The court below expressly found that the value of the Jobos property was included in the sum total for the security of which Amy constituted a mortgage upon all his property in 1895. In *Amy* v. *Amy,* 15 P.R.R. 387, this court held that the mere admission of Amy Pareñó was not enough to establish the fact that he had received the paraphernal properties of the first wife, the value of which represented the bulk of the obligation secured by that mortgage. If that proposition be sound then defendants herein are entitled to the same shelter and comfort that Mateo Amorós received therefrom in the former suit. But for such admission there is no evidence in the instant case that Amy Pareñó ever received any property belonging to plaintiffs other than whatever may be regarded as belonging to them by reason of the alienation of the 80 acres conveyed to Verges.

It is fair to add that plaintiff Carmen Amy Ramú was a minor in 1910 as well as in 1906. She was represented in 1906 by José Lorenzo Castillo, the husband of Josefina, and in 1910 by her father Amy Pareñó.

Another interesting feature of the instant case is the brief history of the property conveyed by Verges to Amy Pareñó, from and after the date of the foreclosure of the Amorós mortgage. In February, 1910, Luis Francisco Verges, in order to protect the interests of plaintiffs, or at least of Josefina, Carmen and Dolores Amy y Ramú, purchased the Trinidad from the successful bidders at the foreclosure sale at a cost of ten thousand dollars American gold ($10,000) and delivered the possession thereof to Josefina and her husband, José Lorenzo Castillo, upon terms and conditions outlined in a letter to Josefina dated March 12, 1910, substantially as follows:

Castillo and his wife were to pay one thousand dollars a year and taxes as rental and were to receive all profits from

their management of the plantation. They were also to bear any losses sustained. The yearly rental was to be credited as instalments upon the purchase price by way of reimbursement over a period of ten years without interest. These payments were to be credited to the account of Josefina, Dolores and Carmen, upon the understanding that at the end of the ten years the property would belong to them. Upon the death of Josefina the lease would terminate, but her interest as part owner would pass to her children. If Castillo should die, the lease would likewise lapse pending a readjustment in which the judgment of Verges in the event of disagreement would control. In case of the decease of either Dolores or Carmen the interest of either or both would revert to Verges to be disposed of as he might deem best. Upon the death of Verges his heirs would carry out his intention along the lines indicated or upon terms more favorable, but in no event less favorable, to the three sisters.

The letter, in conclusion, expresses a desire that the sisters should be protected in so far as possible and should eventually acquire and enjoy the Trinidad and that in case of death the passing of the property into other hands should be avoided as far as possible.

In November of the same year Luis Francisco Verges made his last will and testament in which, after various bequests, he left the remainder of his property, including the Trinidad, to the wife of Eugenio Marcelino Verges and shortly thereafter departed this life.

In August, 1911, Eugenio Marcelino Verges, as agent and attorney in fact of his wife, conveyed the Trinidad to Josefina, Carmen and Dolores Amy y Ramú. At the time of this transfer Carmen was 21 years of age. The deed refers to the letter of March 12, 1910, and to an agreement as having been reached in regard to the execution of a deed for and in consideration of the amount named in that letter but in accordance with the terms and conditions later to be set forth

in the same instrument,—not, as found by the trial judge, for a sum to be paid in a series of annual instalments. The consideration subsequently specified is the sum of $10,000 acknowledged to have been received prior to the date of the deed and this statement is forthwith explained by the further recital that Luis Francisco Verges had confessed such payment in the manner indicated in his said will. The will was not produced at the trial. But Josefina Amy y Ramú testified as a witness for defendants that only the first instalment of rent had been paid and that the property had come to her and her sisters as a gift.

Enrique Amy Pareñó died in February, 1912.

Luis Francisco Verges did not purchase the Trinidad for the purpose of restoring to plaintiffs the legal title thereto. That title was in Amy Pareñó, not in plaintiffs, at the time of the foreclosure proceeding. The general trend of the letter above mentioned indicates rather an intention to protect the interest represented by the second mortgage upon the property in question to the extent of whatever margin in actual value may have existed over and above the sum of ten thousand dollars ($10,000). That letter imposed no obligation upon the wife of Eugenio Marcelino Verges as legatee, much less upon her husband as agent and attorney in fact, to transfer the Trinidad upon terms and conditions more favorable than those specified therein. Although plaintiffs were all of age at the time of this transfer, it did not occur to any of them to question the validity or regularity of the proceedings which culminated in the acquisition by plaintiffs of whatever claim, equitable or otherwise, they may have had upon the property then about to be conveyed to them. If they had any doubt as to the validity of the title that had vested in Verges more than fifteen years before that date they maintained a discreet silence.

It was not until long after Eugenio Marcelino Verges, as agent and attorney in fact of his wife, had waived the pay-

ment of $9,000 in deferred payments as a condition precedent to the transfer of the Trinidad, not until long after the lips of both Verges and Amy had been sealed by death, not until the ordinary action of nullity had been barred by a lapse of more than double the statutory period since the youngest of plaintiffs became of age, and incidentally not until long after the decision of the Supreme Court of the United States in *Longpré* v. *Díaz,* 237 U. S. 512, and of this court in *Del Rosario* v. *Rucabado,* 23 P.R.R. 438, that the present suit was filed. In the circumstances and in the absence of the last will and testament of Luis Francisco Verges we need not speculate as to how far the wife of Eugenio Marcelino Verges would have been bound by any recital in that document as to payment of such deferred instalments, notwithstanding the undisputed fact that no such payment was ever made. See, however, *Pagán et al.* v. *Sellés et al.,* 29 P.R.R. 764.

It is well to remember that the appraised value of the Adela as well as that of the Trinidad in 1895 was in Spanish provincial *pesos* and that whatever money or property plaintiffs received, after the change of sovereignty, was in American gold or its equivalent. There is nothing to show that the Trinidad brought more than the usual percentage of actual value at the foreclosure sale, nor that the purchaser at such sale made any profit on the transaction upon promptly disposing of the property for $10,000. José Lorenzo Castillo and his wife were quite content to pay $1,000 per annum and taxes as rental and to assume any risk involved in this venture extending over a period of ten years. The disastrous results of the hurricane of 1899, and the immediate effects of the change of sovereignty upon the coffee industry, in striking contrast to the rapid increase in value of the coastal cane lands following the American occupation, is a matter of local history and common knowledge. There is, therefore, nothing marvelous in the fact, if it be a fact, that the

Trinidad had depreciated somewhat in value before the legal title thereto was finally vested in the Amy children or that in the meantime the Adela had become worth many times the amount at which it was appraised a quarter of a century before the present action was brought.

Such circumstances may serve to explain the dissatisfaction of plaintiffs with existing conditions, but neither these radical changes nor the events which produced them could have been foreseen by the ordinary observer in 1895 and can not be presumed to have been in the mind of any of the parties concerned at that time.

In April, 1918, Enrique Amy Ramú sold and conveyed to his sisters, Josefina, Dolores and Carmen, his undivided one-fourth interest in the five parcels of land acquired from Amy Pareñó in 1906. Later these parcels were grouped together with the Trinidad and recorded in the registry of property as a single tract. Thereafter the tract last mentioned was cut into three pieces and distributed among the three sisters.

That from and after the time of the previous actions brought against Amy and Mateo Amorós plaintiffs had full knowledge of all the facts now relied upon by them is hardly open to question. The complaint herein, naming the heirs of Eugenio Marcelino Verges y Lapelleux as defendants, is dated September 27, 1921, and according to the record now before us was filed in the district court on September 27, 1920. Defendants pleaded not only ratification and estoppel by election of remedies but also the statutory bar of four years prescribed for actions of nullity by section 1268 of the Civil Code.

Appellees consistently and steadfastly cling to the theory of a substitution of securities for the personal obligation of Amy Pareñó as the principal ground of absolute nullity insisted upon by them, and say:

"The point which we want to establish is not whether or not Verges could receive a sum of money, or whether or not he could

give another, whether he thought of leaving this or that amount of money to the benefit of the minors, or whether he was acting in the name of generosity. The point in which the court is interested is whether it was incumbent upon the minor children of Enrique Amy Pareñó to secure his debt to Verges. If the judicial authorization had been requested for the purpose of having the minors secure the debt of their father for the convenience and protection of Verges, surely no judge could have been found who would authorize such a monstrosity. The interesting feature is the fact that judicial authorization was requested in order to sell the property, and for this purpose it was obtained; and instead of selling, the property was given as security of the debt of the father, and a sale was simulated, and a false and fraudulent deed was executed, and the children lost their property without selling it.

"Our theory is this: The minors could not give consent to the sale, nor to any other contract. Such consent had to be given by the father. But he could not do so without judicial authorization. He requested such authorization for selling, and for that purpose it was granted; and, deviating from the authorization, and moulding it to his own use and benefit, he did not sell but secured his own debt. And, as he did not sell, which was what he was authorized to do, he did not consent in the name of the minors. And, if there was no consent, there was no contract."

The court below, construing preliminary recitals in the orders authorizing a sale which were not before this court on the former appeal, regarded the conclusion reached at that time and based upon the averments of the complaint as decisive of the question presented by the evidence adduced at the trial, although the trial judge is somewhat more conservative and to that extent more plausible than counsel for appellees, as shown by the following extract from the "Statement of the Case and Opinion," upon which the judgment appealed from was based:

"As we have already stated, the authority conferred upon Amy was to purchase for his children and by such purchase to provide security, but not to secure in property belonging to their father the amount of the property sold, for the minors, far from being benefited, were thereby prejudiced, exchanging rights of ownership for more or less effective real property rights.

"And this being so, it must be conceded that Amy Pareñó did not comply with the order of the Court of First Instance of Guayama.

"The legal question as to whether such fault involves the nullity or non-existence of the contract of March 12, 1895, we understand has been decided by the Supreme Court of Porto Rico, which speaking through Mr. Justice Wolf, in passing on a demurrer to the complaint, the question having been raised upon appeal, said:

" 'In his representative capacity as father of the complainants the said Amy had only a right to convey the said property for a consideration that should go to his children or to himself as their representative. He had no right to convey the property for a consideration that confessedly moved exclusively to himself personally. We do not question the actual good faith of Amy or Verges, but when Amy obtained judicial authority for the sale of property for purposes of utility and necessity and then transferred it to secure a debt of his own a fraud was committed on the court and against the minor heirs.

" 'Amy could not, in his representative capacity, extinguish the principal obligation, namely, his own debt, by a conveyance of his children's property who obtained no benefit.

" 'The district court held the contract a valid one and that the action for its annulment had prescribed. The contract was inexistent and all the facts constituting its absolute nullity were known to all the parties.' "

The proposition that "the permission granted to Amy was for a purchase in favor of his children,"—if by that is meant that they were to be named as grantees in the deed of conveyance, or that the newly acquired property was to be conveyed to Amy Pareñó as the legal representative of his minor children and expressly for them,—is not supported by any such phrase, or its equivalent, even in the inductive matter contained in either of the permissive orders in question, or in the only petition for such judicial authorization now available as an aid to construction. Indeed the careful omission of any such statement in the petition referred to is entirely too conspicuous to have escaped the attention of any *fiscal* or judge who might have regarded the inclusion of such a provision as necessary for the protection of minors

in the care and custody of their father, or as proper in such circumstances under the laws in force at the time.

The two orders were based not only upon the petition of Amy Pareñó but also and primarily upon facts disclosed by the testimony of witnesses. The petition expressly refers to a transaction already arranged or agreed upon with Eugenio Marcelino Verges, whereby the value of the property about to be sold would be increased. The purpose of petitioner plainly expressed in the petition was to acquire another property adjacent to or adjoining that already possessed by him, not by his children, in Aguamanil, thereby increasing the value of the property last mentioned. It was this enhancement in the value of that property already owned by Amy Pareñó, not by his minor children, which in due time ("*en su día*") would inure to the benefit of those children rather than to the advantage of anyone else. It was announced in the petition that witnesses would testify to the fact that the property about to be sold was worth no more than the amount for which it had been purchased, and that by virtue of the pending agreement with Verges the value thereof would be increased. This is the reason and the only reason assigned by petitioner for the conclusion reached by him and submitted to the court to the effect that the contemplated alienation would be advisable and advantageous to the minor children.

In the face of this frank exposition of a definite purpose and proposal, together with the specific reference to arrangements already made for the carrying out of the plan proposed and the deliberate disclosure of the identity of the individual with whom such arrangements had been made, it is not lightly to be presumed that Amy Pareñó and Verges perjured themselves or suppressed any of the essential facts, circumstances or details involved in the agreement submitted to the court for its approval. Apparently they were the only witnesses available at the time as to these matters and we

have no reason whatever to assume that neither of them took the stand. On the contrary, both orders proclaim that "the certainty of the desirability of the sale in question" was established by the testimony of witnesses produced at the hearing, and the order of December 20th adds "because it would be beneficial to the minors." Both orders refer to a favorable report by the *fiscal*. The earlier of the two orders indicates that the evidence adduced at the hearing showed that the property about to be sold was worth not more than 1,500 *pesos* and that "as a result of the negotiation for the purchase of other land adjoining the coffee plantation already mentioned would attain a value of 3,500 *pesos*." These findings made in July, 1893, anticipated in a general way the entries made by Verges in March, 1895, upon consummation of the negotiation referred to by the witnesses and the judge of first instance. And the further finding as to the "utility" of the contemplated alienation is based by the judge of first instance directly upon this aspect of the negotiation then pending between Amy and Pareñó and Verges. These findings must be construed in connection with the preceding statement contained in the same order as to the purpose of Amy Pareñó to acquire other property adjoining that already possessed by him in Aguamanil, and in this manner to secure in due time the interest of his minor children. So construed, they can not be held to imply that the title to the newly acquired property was to be vested directly and immediately in the minors as a condition precedent to the consummation of the proposed transaction. That transaction as a whole involved the alienation of a property worth approximately 3,000 *pesos* in exchange for another said to be worth at the time 30,000 *pesos*. As shown by the finding last above mentioned and by subsequent events more or less in harmony therewith the children were to be credited with the sum approximately double the value of the Jobos property, to be secured in due time by appropriate action on the part of the

father. The idea that the father intended to acquire directly for and in the name of his minor children a property worth ten times the value of that already belonging to them and about to be alienated is utterly inconsistent with a purpose on the part of the father through the acquisition of such larger tract to increase the value of properties already owned by him and thereby in due time the better to secure the interest of such minors. The acquisition of such larger estate directly for and in the name of the minors would not merely double the value of the property formerly owned by them as contemplated by the judge authorizing the transfer, nor simply secure "what belonged exclusively to them," but would multiply the value of such previous holdings by ten and obviate the necessity of furnishing any security whatever by substitution of a full and absolute ownership of the property received in exchange for what theretofore had belonged exclusively to the said minors. In so far as Verges was concerned the result was a mere exchange. He parted with one property and acquired another. But from the standpoint of Amy Pareñó and his children, the situation was quite different. The legal title to the Jobos property was in the children, the usufruct in the father. The children were to part with their legal title and the father with his usufruct. In order to compensate the children for the loss of their title the father was to assume an obligation amounting to twice the value of the Jobos property, and in due time to provide proper security for the fulfilment of this obligation. The language of the second order following that of the petition in setting forth the purpose of the proposed double transfer leaves little room for doubt in this regard. Had the court or the parties to the proposed transaction contemplated an exchange of titles without more, there would have been no need for the elaborate explanation as to how the value of the property already belonging to the minors was to be increased or of limiting the amount of such increase

to 100 per cent of such value or of giving to the transaction the form of a double sale. And whether the device of the double sale was indispensable or not, or whether in any event it was well adapted or not to the carrying out of the proposed plan is a matter with which we are not concerned in the total absence of any indication of an intention on the part of Amy Pareñó or of Verges to misrepresent the facts or to deceive the court, and in the total absence of anything to show that the court was in fact deceived, whether intentionally or otherwise. Nor can it be successfully contended that the resort to a double conveyance in the form of a double sale as a mere matter of convenience, when both court and *fiscal* were fully informed as to all the facts, is a badge of fraud. Equally inadequate to create confusion in any open mind is the circumstance stressed by the trial judge in the instant case that Amy Pareñó referred in his petition to the small group of properties then owned by him as "the Trinidad." That the owner of a small parcel of land called Trinidad should give the same name to a larger adjoining tract upon acquisition thereof is neither a satisfactory ground for suspicion nor an adequate cause for bewilderment.

The consideration in so far as the children were concerned was, as we have already said, the obligation assumed by the father representing an amount double the value of the property about to be alienated, coupled with the vastly increased financial responsibility and apparent ability of the father to provide adequate security for the fulfilment of that obligation and the reasonable expectation that he would promptly proceed to comply with the duties imposed upon him by existing law. Hence the stipulation between Amy and Verges contained in the private document of even date to the effect that Amy would arrange with the children, not as erroneously translated in 15 P.R.R. 399, "for the legal transfer to them of the property," but "for the transfer of their interest from the one to the other in legal form"

(*"entendiéndose con sus hijos para transferir su propiedad de una a la otra estancia en forma legal"*). Hence also the perfect compatibility between the two otherwise utterly irreconcilable statements made by Verges in the journal entries, *supra*. In the first of these two entries Verges, viewing the matter as a transaction between himself and Amy, speaks of it as a mere exchange of properties. But the final paragraph of the second entry made at the same time sets forth the true aspects of the transaction as between Verges and "the children of Tututa":

"E. M. Verges, Capital Account. By a rebate in estimate which I make in the account of Amy by virtue of this transaction, this sacrifice being made for the benefit of the minor children of Tututa, for which their father should provide security on the coffee plantation in Guamaní, $3,467.86. Total, $6,667.86."

It is no answer to this view of the situation to say that Amy Pareñó could not enter into such an agreement with his children for the simple reason that they were represented directly by the court to which the father had applied for judicial authorization of the contemplated conveyance, which authorization of necessity involved and included approval and acceptance of the consideration in question. The time, the manner and the method by which this principal obligation was to be secured having been left by the court entirely to Amy Pareñó, subject only to general principles and provisions of law, any irregularities or defects in the mortgage subsequently constituted by him could not operate retroactively to render the title already vested in Verges absolutely void.

Or assuming, for the sake of argument, the soundness of the theory insisted upon by appellees that the original transfer of the Trinidad in 1886 was nothing more than a sort of Welsh mortgage, then the release of that security in 1895 and the acceptance by Verges of the Jobos property in full payment and satisfaction of Amy's obligation to him

might be regarded as operating an equitable assignment of such indebtedness which would be a consideration flowing directly from Verges to the minor children of Amy Pareñó, who, in any event, as a result of such a transaction and whether by assignment or subrogation, would thereafter stand in the shoes of Verges.

We need not, therefore, as we have also already pointed out, dilate upon the more or less doubtful doctrine of election of remedies nor rest our decision as in previous cases of this kind directly upon any implied ratification by plaintiffs of the transaction which involved the alienation of their property. Nevertheless, the evidence adduced by defendants in support of their defense upon this ground has provided a better basis for the theory of ratification than was laid in some of the former cases, as for instance *Torrellas* v. *Santos et al.*, 32 P.R.R. 84, where a majority of this court in turn found "the evidence of confirmation or ratification stronger than in the case of *Díaz Llenza* recently affirmed by the Circuit Court of Appeals, First Circuit, 285 Fed. 132."

For the purposes of this opinion it may be conceded without holding that upon becoming of age and within four years thereafter plaintiffs might have brought an action of nullity notwithstanding the unqualified judicial authorization for the alienation of their property. But the judgment rendered by the court below in the present revendicatory action must stand or fall upon the proposition that the alienation in question was not only voidable but absolutely void. That proposition rests in turn first upon the theory of a substitution of security and second upon the alternative hypothesis of a total want of consideration. The first of these two contentions is utterly untenable. The second is somewhat more plausible but likewise, as we have shown, without foundation.

We need not apologize for the failure of the *fiscal* and of the judge of first instance in 1895 to foresee and to

anticipate the possibility of a substitution by Amy Pareñó of a second mortgage for a first lien upon the property about to be acquired from Verges. We do not condone any indifference on the part of judge and *fiscal* to the best interest and welfare of the minors if such indifference can be fairly inferred from the omission of a requirement as to the constitution of a first mortgage upon such property as a condition precedent to the vesting of title to the Jobos property in Verges. In the absence of any such requirement the subsequent failure of Amy Pareñó to provide adequate security for his performance of the obligation assumed by him was at most a partial failure of consideration and not a total absence of any consideration. But even if there had been no consideration, as that term is understood in American and British jurisprudence, there would still be ample room for a disquisition upon possible distinctions to be drawn between the good, sufficient and valuable consideration of the common law and the "cause" of the civil law contract.

The two orders authorizing a sale follow the phraseology of the petition presented by Amy Pareñó. The word alienation occurs but once. But it does not appear that the petition was drawn by the petitioner and there is no presumption that it was so drawn. On the contrary, a recital in the mortgage subsequently constituted by Amy in favor of his minor children explains the two separate proceedings, one in regard to each of the two parcels of land belonging to such children, as due to the fact that the matter had been entrusted originally to a friend or other representative who through a misunderstanding failed to include one of the two properties in the original application. Incidentally, a want of familiarity with the details of form and procedure in such matters is mentioned by Amy Pareñó as one of two reasons for having placed the matter in the hands of an agent. But whether the idea of a double sale as the appropriate legal form to

which the transaction should be reduced originated in the mind of Amy, or whether it was the artificial device of some other amateur pleader, possessed of a narrow concept of the latent possibilities involved in adapting stereotyped forms of conveyancing to circumstances, is not a matter of vital importance. The proposed form of conveyance, if not admirably adapted to the end in view, was not resorted to as a mask to conceal a conspiracy and a fraud upon the court, but was at most an awkward way of accomplishing an undisguised and clearly defined purpose.

The theory of the court below that the judge of first instance contemplated a conveyance directly to the minors or to Amy Pareñó for them as their legal representative not only involves the interpolation of such a provision in the two orders constituting the judicial authorization but is plainly incompatible both with the general tenor and effect of those two documents and with every detail bearing in any way upon the question of such intention. In the circumstances of this case to hold that the conveyance to Verges was an absolute nullity simply and solely because it was not a sale in the strict technical sense of that term, upon the theory that the judicial authorization for a sale excluded the idea of any other species or form of alienation, would be to draw a distinction without any appreciable difference in purpose, intention or result, to mistake shadow for substance and to substitute a superficial legal technicality for substantial justice.

The judgment appealed from will be reversed and the action dismissed.

Mr. Justice Wolf dissented.

### DISSENTING OPINION OF MR. JUSTICE WOLF.

I cannot see that the facts produced at the trial fundamentally changed the legal aspects of the case as developed

in our opinion on the demurrer. *Amy* v. *Verges,* 33 P.R.R. 359. No valid consideration passed from Verges to the children of Amy. Verges knew that he was canceling a debt that Amy owed and no matter how benevolent the intention of Verges was to the children of his sister, that was all the consideration that actually passed from Verges to Amy. Emphasis should be laid on the fact that Verges knew and was bound to know that Amy was attempting to dispose of his children's property while in fact paying his own debt.

The order of the court authorizing Amy to sell the property of his children in my opinion cannot help Verges. That order was the mere habilitation of Amy to give him sufficient authority to sell the said property. An analogy may be found in the case of *People* v. *Rosaly,* 227 U. S. 270, where the Supreme Court held that the enabling words ''to sue and be sued'' merely fixed the status of the body politic. The order in question did not authorize Amy to do anything but sell. It did not authorize him to pay his debts or give the property of his children away. Even if Verges had handed Amy the cash for the property and Amy had used the money to pay his debt to Verges, a court of equity would recognize the transaction as not transferring any consideration to the children of Amy.

Nor do I find any ratification or estoppel in the children of Amy. The fact that the father, indebted to his children in very many aspects, made a blanket second mortgage to them out of which they realized a little something, cannot constitute a ratification. Like any other creditor they had a right to prelate any profits or benefit they obtained to some other one of the many obligations owing to them by their father.