# LONGPRÈ *v.* DIAZ.

## ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR PORTO RICO.

No. 51.  Submitted March 15, 1915.—Decided June 1, 1915.

Under the law of Porto Rico as it was in 1892 a widow and guardian
  *ad litem* had no authority to give the property of the minor child in
  payment of a debt of the deceased father in private sale, and there
  was no authority in any judge to approve such a voluntary partition
  as was involved in this action.

A disposition of a minor's property by private sale in Porto Rico, un-
  authorized by the local law, even if approved by a judge, is void,
  and the minor, on coming of age, may sue in ejectment under the
  provisions of the Civil Code of Porto Rico, then in force and ap-
  plicable in this case, without first seeking rescission of the partition.

An unsuccessful defendant in ejectment must, unless a purchaser in
  good faith, account for the fruits gathered during possession.

While under the Civil Code of Porto Rico good faith is presumed until
  bad faith is shown, one who purchases property belonging to a minor
  under a confessedly non-existent and void instrument cannot be
  a purchaser in good faith.

The rule that the burden of proof to show bad faith is on him who
  charges it, does not apply where bad faith is shown *ipso facto* by the
  acquisition being contrary to law.

Under Art. 442, of the Civil Code of Porto Rico, an heir who possessed

property in personal good faith is relieved from liability to account after ejectment, for the fruits during his possession, notwithstanding his ancestor from whom he derived the property may not have acquired it in good faith.

THE facts, which involve the construction and application of the laws of Porto Rico relating to the accountability for fruits and profits of real estate of one evicted therefrom, are stated in the opinion.

*Mr. H. H. Scoville* and *Mr. Jose R. F. Savage* for plaintiff in error.

*Mr. Francis H. Dexter, Mr. Joseph Anderson, Jr.,* and *Mr. Damian Monserrat, Jr.,* for defendant in error.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

Clemente Diaz y Gonzalez, residing in Viequez, Porto Rico, there died in April, 1890, leaving a widow and an infant son, the issue of their marriage. The deceased was the recorded owner of a piece of farming property known as Destino, as well as of other pieces of property of small area and value, all of which were his separate estate, having been acquired before marriage. By the provisions of the Code it is conceded that the minor was the sole legal heir of his father, taking all his property, subject however to a usufruct of one-third in favor of his mother, the widow. In April, 1892, in conciliatory proceedings before a municipal magistrate preparatory to a suit to be brought by Ramon Aboy Benitez to enforce a debt which he asserted against the estate, the widow admitted that Aboy was a creditor of the estate for a little over three thousand pesos, evidenced as to a considerable part by the notes of the deceased and the remainder embracing doctors' bills, taxes and money advanced for the support of the widow and infant child. The creditor,

presumably in consequence of this acknowledgment, agreed to await payment until March, 1893, when a lease would expire which existed on the property known as Destino in favor of an agricultural partnership styled Mourraille & Martineau. In the following August, 1892, on the petition of the widow the court of first instance of Humacao, within whose territorial jurisdiction Viequez was situated, recognized the minor as the sole heir of the father and as such entitled to his estate subject to the usufruct in favor of the widow as above stated. The court subsequently on the petition of the mother appointed a paternal uncle of the minor, Santos Diaz y Gonzalez, his guardian *ad litem* to act for and represent the infant in matters where from conflict of interest or otherwise his mother would be incapacitated from so doing. Thereafter Aboy by a notarial act transferred to the firm of Mourraille & Martineau the greater part of his acknowledged debt, the widow intervening in the act for the purpose of taking cognizance of the transfer and in addition to recognize certain small debts held by the firm against the estate.

Contemplating an extra-judicial partition, the widow and the guardian *ad litem* then united in the appointment of an accountant to accomplish that purpose, who drew an agreement of so-called partition which was executed by the parties on December 27, 1893. In the agreement the liabilities of the estate were enumerated and its assets were stated and valued and the property of the entire estate was conveyed. For the purposes of this case it suffices to say that as the debt due to the firm of Mourraille & Martineau was as stated precisely equal to the value affixed to the farm Destino, that property was transferred and delivered to the firm in extinguishment of its debts and a like course by transferring other property was pursued as to the comparatively small debt of Aboy. The small remainder of the estate was declared to be subject to the ownership of the minor and the one-third usufruct

of his mother. To make this private agreement for voluntary and extra-judicial partition authentic in form by placing it of record, the widow, on February 1, 1894, appeared before a notary and exhibiting the agreement deposited it among the archives of his office after making the necessary declarations to accomplish that purpose. This being done, a copy of the agreement as authenticated and deposited was presented to the judge of the court of first instance of Humacao for his approval, which was by him given with a direction to the officer of registration to place the agreement as authenticated upon the public records. In April, 1894, this was done, thus transferring on the public record the title of the farm Destino from the name of Diaz, the deceased, to the name of the firm of Mourraille & Martineau. It is conceded, however, that in the meanwhile, in February, 1894, as a result of the transfer made under the so-called partition agreement delivery of the possession of the farm Destino was made to the firm and they held the same asserting ownership thereof.

By the provisions of a notarial act executed in May, 1894, which was inscribed upon the public registry, for the purpose of dividing the assets of the firm of Mourraille & Martineau among the partners, the title to the farm Destino passed from the firm to the individual name of Victor Mourraille. By his death which, although the date is somewhat obscure in the record, occurred probably in January, 1895, the property passed to the plaintiffs in error, his widow and heirs. Whether they took as the result of intestacy or by will is not disclosed and is immaterial to consider, since it is conceded that the rights enjoyed by them were but a continuation of those possessed by Mourraille himself in virtue of the proceedings conveying the property Destino to the firm and of the attribution of the property to Mourraille in the division of the firm assets,

More than twenty years after the death of his father the
minor, Clemente Diaz, having been duly emancipated,
commenced in a local court in Porto Rico this suit against
the present plaintiffs in error, the widow and heirs of
Mourraille, in revendication of the property called Destino
previously transferred to them under the circumstances
above stated. They removed the case to the court below
and successfully resisted a motion to remand. Thereupon
the petition was amended. As amended in substance it
asserted that the plaintiff was the duly registered owner
of the property, and that his possession had been wrong-
fully disturbed in 1894 by the action of the defendants or
their author in taking possession of the same. A brief
outline of the facts which we have previously stated was
made and the prayer was for a recovery of the farm called
Destino and for a decree for fruits and revenues from the
time of taking possession in 1894. An answer was filed
which was demurred to for insufficiency. It would seem
that before the demurrer was passed upon an amended
and fuller answer was filed. By this answer the facts
which we have previously stated were in substance ad-
mitted. The capacity of the plaintiff to sue was chal-
lenged, first, because as an heir of his father he had no
right to do so, and second, because he was without au-
thority to recover the property without previously suing to
rescind the partition proceedings and the recorded title
resulting therefrom and thus collaterally assail those pro-
ceedings. The want of right to recover as a question of
merits was denied, first, because of a term of prescription
which was pleaded, second, because of the validity of the
partition proceedings and the conclusive effect of the judg-
ment of approval given to them by the proper court, third,
because a suit to rescind such proceedings was barred by
a prescription which was also pleaded, fourth, because in
any event the plaintiff was without authority to sue to
recover the fruits and revenues of the property because

during his minority they were collectible, if due, by his mother as administrator, of his estate and because even in case there was a right to evict, the fruits and revenues could not be recovered from Mourraille because of his good faith, nor from the defendants holding under him because of their good faith. This answer was again demurred to as stating no defense. The court sustained the demurrer in so far as it questioned the sufficiency of the technical defenses advanced by the answer on the ground that the proceedings of so-called partition were absolutely void and the approval affixed by the judge of the court of first instance of Humacao was equally null because of an absolute want of jurisdiction on his part to take the action in the premises which he had taken. The answer was again amended. The defenses to the merits concerning the want of right to recover the property or its fruits and revenues as well as prescription were all in the fullest way reasserted, and in addition a counterclaim was presented asserting that the defendants in the event of eviction were entitled to recover the amount of the debt owned by Mourraille & Martineau which had been used in the so-called partition proceedings to pay for the Destino property, with interest thereon at six per cent.

Upon the issues which were made by this answer and counterclaim the case came finally to trial before a jury. On the opening the plaintiff to make out his title after establishing his heirship, offered the documents establishing the facts concerning the partition which we have stated and the defendants expressing their purpose to offer no further evidence on those subjects, the court applying the conclusion which it had reached on the demurrer as to the absolute nullity of the partition sale, instructed the jury that on the question of title there must be a verdict for the plaintiff. Thereupon the trial proceeded solely as to the right to recover fruits and revenues and no evidence on any other subject was offered. It was

agreed between the parties that there should be deducted
from any sum of fruits and revenues found to be due one-
third thereof upon the theory that they belonged to the
widow of Diaz, the mother of the plaintiff, in virtue of her
usufruct and were not involved in the suit. And it was
further admitted that the claim asserted in the counter-
claim was valid and there should be a verdict for the re-
covery of the sum claimed with interest. Considerable
evidence as to fruits and revenues was offered and some
exceptions were taken by the defendants to rulings of the
court admitting evidence concerning the subject on the
ground that by its admission too great leeway was af-
forded for speculative damages. The defendants specif-
ically requested that the jury be instructed that if they
were in good faith they were not liable for fruits and
revenues, which was refused and an exception taken. And
an exception was also reserved concerning the right to
award fruits and revenues to the plaintiff for the period
covered by his minority because of the right of his mother
to administer his property during such time. There was
a verdict and judgment for the property and for the rents
and revenues during the entire term of adverse possession,
whether held by Mourraille & Martineau, by Mourraille
himself, or by the defendants holding under him.

There are twenty-seven assignments of error, but we
shall confine our attention to the questions pressed in ar-
gument. The validity and effect of the so-called partition
proceedings on the title of the property sued for underlies
every consideration urged and we therefore, as did the
court below, first consider that subject. While it is obvious
that the property left by the deceased and which passed to
his heir, the minor, was bound for the debts of the deceased
and subject to be disposed of under lawful proceedings to
pay the same, we think it is indisputably apparent that
there was an absolute want of authority on the part of the
widow and guardian *ad litem* to give the property of the

minor in payment of an alleged debt of the estate of the father. We say this because the so-called partition and the sale of the property by a mere private agreement were directly in the teeth of the requirements of the law concerning the administration and sale of a minor's property and therefore such mere private sale created no rights whatever conflicting with the title vested in the minor in virtue of his heirship. And we are of opinion moreover that by the same token it conclusively results that the judge of the court of first instance of Humacao was absolutely without jurisdiction to approve the so-called voluntary partition proceedings and therefore that no rights whatever arose from such sanction. We do not stop to refer to the requirements of the local law which were absolutely disregarded in the private sale relied upon, since in substance it is not disputed that if the proceedings by which the property was sold had the character which we affix to them, they were wholly unauthorized by the local law and indeed were prohibited by its express or implied provisions. In the light of this conclusion we are of opinion that the lower court committed no error in overruling the challenge made by the answer to the capacity of the plaintiff to sue in revendication (ejectment) upon the assumption that he was bound first to seek the rescission of the partition proceedings and to obtain an annulment of the order of the judge approving the same, since it is impossible to conceive that the preliminary duty existed to obtain the annulment of that which was already null or to seek to rescind that which never in contemplation of law had any existence whatever. In passing we observe that the contention that the plaintiff as the sole heir of his father's estate and as such the owner of the entire property sued for was without capacity to sue is, we think, refuted by its mere statement.

Aside from the objections to which we have referred concerning the admissibility of evidence as to the quantum

of fruits and revenues which we shall hereafter notice, this reduces the case to a consideration of the right to recover fruits and revenues. The question arises in a two-fold aspect: First, as to the liability for fruits and revenues of Victor Mourraille, the author in title of the defendants, and second, of the defendants themselves. In both, questions of fact and law require to be considered, the first involving the existence of good faith, and the second, the legal responsibility for fruits and revenues resulting from the ultimate conclusion as to the existence of good faith drawn from the proof on the subject.

The provisions of the present Porto Rican Civil Code controlling the subject, which are in substance the same as those of the Spanish Civil Code previously governing in Porto Rico, are as follows, the numbers of the articles of the former Spanish Code being printed in brackets:

"SEC. 453. [451] A possessor in good faith becomes the owner of the fruits collected, so long as the possession is not legally interrupted.

"Natural and cultivated fruits are considered as collected from the time they are gathered or separated.

"Civil fruits are considered as daily proceeds, and belong, in that proportion, to the possessor in good faith.

"SEC. 436. [433] A *bona fide* possessor is deemed to be the person who is not aware that there exists in his title or in the manner of acquiring it, any flaw invalidating the same.

"A possessor in bad faith is deemed to be any person possessing in any case contrary to the above.

"SEC. 437. [434] Good faith is always presumed, and any person averring bad faith on the part of a possessor, is bound to prove the same.

"SEC. 444. [442] Any person who succeeds by hereditary title shall not suffer the consequences of a faulty possession of the testator, unless it be shown that he was aware of the defects affecting such possession; but the

effects of possession in good faith shall benefit him only from the date of the decease of the testator.".

*First, As to the good faith of Mourraille.*

As there was no evidence from which the want of good faith of the firm of Mourraille & Martineau or of Mourraille himself was deducible except the proof concerning the giving in payment of the minor's property as the result of the voluntary partition, it follows that unless such evidence established the want of good faith there was error under the very terms of the Code in allowing the recovery of fruits and revenues against Mourraille for the period of his possession as distinguished from the possession of the defendants holding under him. As we have already, however, pointed out that the partition proceedings were absolutely void because in violation of the requirements of law concerning the sale of the minor's property, it follows that the absence of good faith clearly resulted from taking possession of the property and attempting to hold it under a confessedly nonexistent and void instrument. The conclusion so irresistibly arises from the premise upon which it is based that reference to authority on the subject might well be dispensed with. Authority, however, is not wanting, since in countries where the civil law prevails and the right to retain fruits and revenues in the event of eviction in case of good faith is recognized, with substantial unanimity it has always been considered that the existence of good faith was excluded and the conclusion of legal bad faith necessarily arose against one who was a party to an attempt to acquire property by a deed, conveyance or proceeding which was absolutely void because in violation of prohibitory laws. Such was the rule in France prior to the Code Napoleon. So also under that Code the doctrine has been expressly announced and applied by the Court of Cassation. See Hérit. Daudé C. Etienne, Cass. 19 Dec. 1864, Journal Du Palais for 1865, p. 27, and note 3 where a reference is made to other ad-

judged cases on the subject and to doctrinal writers sustaining the principle. So in Louisiana many years ago it was recognized that "The purchaser of minors' property by private agreement is a possessor in bad faith." *Fletcher* v. *Cavalier*, 4 Louisiana, 267, 277; *Morand* v. *New Orleans*, 5 Louisiana, 226, 242. And the same principle was applied to "one possessing by a judgment of a court without jurisdiction." *Lowry* v. *Erwin*, 6 Rob. 192. And that such was the law in Spain both before and after, the Civil Code would seem to be undoubted since Scaevola so treats it. Thus that author in his Commentaries on the Spanish Civil Code, Volume 8, pages 308 *et seq.*, in commenting on Article 442 (identical with § 444 of the Porto Rican Civil Code,) says:

"This rule, which is but an expression of the principle that 'the burden of proof is upon the one who makes the charge,' . . . in our opinion had no application in the event the possession takes its origin in a faulty manner of acquiring, either by being contrary to provisions of law, or through lack of compliance with certain requisites. In this case, we said, that proof was not necessary, inasmuch as bad faith was shown *ipso facto* by the single circumstance of the acquisition being contrary to law. 'Thus,' we said, 'he who acquires a thing belonging to a minor, without authorization from the family council, he who purchases it, regardless of the prohibitions of Article 1459, cannot be considered a possessor in good faith, because he knew beforehand that he could not acquire it, that the acquisition was faulty, being contrary to law, and because no one is permitted to plead ignorance of the law.'"

And this brings us to consider under a second heading whether the burden of proof was sustained and the want of good faith of the plaintiffs in error, the heirs of Mourraille holding under him, was established as the result of the proof of Mourraille's own bad faith.

*Second, As to the good faith of the heirs of Mourraille.*

The contention of the plaintiffs in error pressed below and here urged is that even conceding the absence of good faith of Mourraille and their liability as his successors or heirs as the result of the eviction to refund fruits and revenues during his term of possession, the liability of the defendants beyond this to pay rents and revenues did not arise because the proof of the want of good faith in Mourraille did not establish the want of good faith of his heirs holding under him. And because of this proposition it is insisted the court below erred in refusing to charge that in the absence of proof of bad faith on their part they were not liable on eviction for fruits and revenues during their possession as distinguished from that of Mourraille. The contention is rested upon the provisions of § 444 of the Porto Rican Code (Article 442 of the Spanish Code), saying:

"Any person who succeeds by hereditary title shall not suffer the consequences of a faulty possession of the testator, unless it be shown that he was aware of the defects affecting such possession; but the effects of possession in good faith shall benefit him only from the date of the decease of the testator."

This provision, it is insisted, causes the liability of the heirs to pay fruits and revenues upon their eviction to depend upon their personal good faith disconnected from and uninfluenced by the bad faith found to exist in Mourraille, their author, under whom they held. On the other hand this is met by the contention that by the very nature of the possession of the heirs under and through Mourraille as his legal successors continuing, so to speak, his personality, the bad faith of their author was imputable to them and their liability as possessors in bad faith to restore fruits and revenues is consequently established. It is conceded by both parties that the text of the section relied upon was introduced into the Spanish Code as the

result of an original conception, since it was not found
in the Code Napoleon and not expressed in the codes which
have followed that Code, as for instance the Code of
Louisiana. It is also to be conceded that as the text in the
Spanish code had received no authoritative interpretation
when it was adopted in so many words into the Porto
Rican code, therefore the adoption carried with it no
previous authoritative interpretation. The respective
contentions turn upon a discussion of the text relied upon
and the support which each side assumes is afforded their
view of the subject derived from Spanish doctrinal writers
on the Code. Thus in favor of the doctrine that the heir-
ship to the property carries with it as an inseparable in-
cident the heirship to the bad faith of the author or an-
cestor, especially where such bad faith of the author is the
resultant of the void nature of the immediate title under
which he held the property, great reliance is placed upon
a passage in the work of Scaevola, the eminent legal writer
already referred to. The passage in question is found in
the comment of the author upon Article 442 of the Code
immediately following the passage which we have already
quoted concerning the proof of bad faith established as
against one who has acquired through an absolutely void
deed or proceeding, and is as follows:

"Now then: will the explanation be applicable to the
successor? . Our opinion inclines to the affirmative. The
case presented by us deals with an error of law, and this
no one should be ignorant of. The successor cannot main-
tain that he is ignorant of it: *first*, because it is not possible
to claim ignorance of the law; *second*, because on accepting
the inheritance, from the moment a person is converted
into a successor, there is no other presumption but that
he has examined the titles of possession of his author and
predecessor. Acceptance of the inheritance implies pre-
vious examination of everything concerning it. How can
it be lawful for a successor to allege that he believed, for

example, that an estate possessed by his predecessor was
held in good faith if he had acquired it in a faulty manner,
contrary to law? Such allegation would be inadmissible,
because the successor, by the mere fact of being such suc-
cessor, is presumed to know the titles of possession of the
predecessor, and therefore the faults attached thereto.
On the supposition of which we are speaking, we repeat,
bad faith is inherent to transmittal to the successor, inas-
much as the successor continues the personality of the
predecessor."

On the other hand reliance to the contrary is placed
upon opinions expressed by other Spanish doctrinal
writers on the Code or books dealing with that subject
as follows: Manresa, Commentaries on the Spanish Civil
Code, Vol. 4, p. 165 et seq.; Spanish Judicial Encyclo-
pedia, Francisco Seix, Editor, Vol. 4, p. 665 et seq.; Diaz
Guijarro y Martinez Ruiz on the Civil Code, Vol. 3,
p. 311. Without admitting that the authorities thus
relied upon are entirely reconcilable one with the other
or afford what is deemed any safe rule for elucidating
the significance of the section of the Code in question,
we are of opinion that it must be conceded that these
authorities do not coincide with the significance attrib-
uted to the article of the Code under consideration
stated by Scaevola in the passage just quoted. Because
of this situation we do not particularly refer to the au-
thorities last relied upon since at best we can find nothing
in them to relieve us of the duty of interpreting the
section in question or which renders the performance
of the duty of interpretation less difficult. In view of
this situation we come to consider the subject with which
the article deals primarily from the point of view of his-
torical evolution in order if possible to throw light on
the doctrinal conditions which led to the incorporation
of the article into the Spanish Code and thus ascertain
the intent and purpose which controlled its enactment

and then to interpret the provision from that vantage point.

Speaking in a general sense, before the Code Napoleon, certainly in the provinces more largely influenced by the Roman law, the doctrine of the right of a possessor in good faith to retain the fruits and revenues in case of eviction was firmly established. It was also equally clearly recognized that the bad faith of the author was attributable to one holding under him as an heir or universal successor. If complexities obtained in the application of the doctrine, they in a large measure resulted from questions concerning the burden of proof as to good or bad faith. Pothier De la Propriété, n. 332 et 336; Domat Lois civ., 1ᵉ part., liv. 3, tit. 5, n. 14. And see also a statement of Laurent on the subject, t. 6, n. 221. The general doctrine as to non-liability for fruits and revenues on eviction in case of good faith was embodied in the Code Napoleon in Articles 549 and 550. Two things came at an early day to be recognized under that Code: First, that it had come to pass that so far as the restitution of fruits and revenues was concerned, the burden of proof to establish the absence of good faith on the part of a possessor whose eviction was sought was upon the one seeking the eviction. The doctrine as it came to be crystallized is thus stated by Laurent, t. 6, n. 225, p. 298: "According to the principles generally prevailing the burden of proof would rest upon the possessor of property to prove his good faith. In effect under general principles the owner seeking to recover property would only be obliged to prove his right of property and when that right was established, by that fact alone the fruits of the property would belong to him as the result of the general rule established by Article 547. The possessor who claimed the fruits would then become an actor on his own account and if the correct principles were rigorously applied, he would be obliged to prove

the foundation of his demand, that is to say, his good faith. However, it is established that the possessor under these circumstances is not obliged to prove his good faith because by the text of Article 2268 good faith is always presumed and the burden is cast upon him who alleges bad faith to prove it."

Second. So also in some measure, it may be, because of this view concerning the burden of proof and from many other considerations, the preponderant opinion sustained by judicial decisions and supported by doctrinal authority came to be that under the Code the question of good faith was a personal one, depending so much upon considerations of that character that the good faith of the possession of the author was one thing, and the good faith of those holding under him, whether heir or other successor, was another. From this it came to be acknowledged that the right to retain fruits and revenues in case of eviction might exist in favor of an heir who was in good faith from the time of his possession, although it was conclusively established that the author or ancestor was in bad faith and the duty on the heir would exist to return so much of the fruits and revenues as accrued during the possession of the author. The principle was upheld by the Court of Cassation in Parent de Chassey C. La Commune de Monceaux-le-Comte, May, 1848, Journal Du Palais for 1849, Vol. I, p. 12. The doctrine was thus succinctly stated in one of the syllabi: "The heir of a possessor in bad faith may successfully avoid the restitution of the fruits in favor of the true proprietor by setting up his own personal good faith." See also a note to the case in which many authorities supporting the doctrine are collected. Demolombe (Vol. IX, n. 613, p. 558) thus states the strongly dominant opinion on the subject: "We ask simply if the fruits which the heir himself may have collected during his possession belong to him in virtue of his personal good faith. The affirma-

tive seems today to have triumphed both in jurisprudence and in doctrine where it counts among its supporters many authorities· of the most imposing character." Among those cited are Marcadé, t. II, Art. 550, n. 2; Toulier, t. II, p. 263; Demante, t. II, n. 385 *bis.* VIII; and also a list of cases adjudged in numerous intermediary courts and courts of original jurisdiction.

The doctrinal writers in pointing out the personal character of the question of good faith for the purpose of ascertaining the duty to return fruits and revenues frequently directed attention to the fact that it was easy to conceive of a case where there might be bad faith on the part of one possessing in virtue of his heirship and good faith on the part of the author and *vice versa.* The argument that to distinguish because of personal good faith between an heir and his author who had been in bad faith would be purely academic, since the heir in virtue of his liability as heir for the obligation of his ancestor would be obliged to respond for all the fruits and revenues as heir if not as possessor, was met by pointing out that the effect of considering the question as one of personal liability, while it did not break the continuity of heirship, was to sever the continuity of possession and responsibility therefor and consequently to cause it to result that while the heir as heir would be responsible for the bad faith of the ancestor during his, the ancestor's, term of possession, he would not be responsible as heir for the term in which he, the heir, had possessed the property in good faith.

It is true, as pointed out by Demolombe, following the passage previously quoted, that the doctrine of the personal character of the good or bad faith so far as the obligation to restore fruits and revenues in case of eviction was concerned, was not universally accepted. It is true also that such doctrine has not been applied under all the codes which literally followed the Code Napoleon. Thus in

Louisiana, where in substance the provisions of the Code Napoleon were incorporated in the Civil Code in Articles 3450, 3451, 3452 and 3453, the rule recognized in the law of France before the Code Napoleon has been applied in many decisions. But this subject need not be entered into, since our purpose is not to discuss the relative merits of the doctrine prevailing in France under the Code Napoleon as compared with the contrary view, but only to make clear the fact of the prevalence of the doctrine in France under the Code as a means of elucidating the interpretation of the provisions of the Spanish Code not only so far as they adopt the Code Napoleon, but as they added new provisions on the subject in question.

Coming to so do and looking in a general way at the text of Article 442 and of the cognate articles immediately associated with it in the Spanish Code, we are of the opinion that Article 442 and those dealing with the same subject were adopted for the express purpose of causing the law under that Code to conform to the principle of the personal character of the question of good faith so far as the return of fruits and revenues was concerned in case of eviction, and thus enable an heir who possessed in personal good faith to relieve himself from liability despite the personal bad faith of his ancestor or author. In other words we think that the new provisions were inserted in order to adopt in the Spanish Code the dominant interpretation prevailing in France under the Code Napoleon and to exclude the possibility of taking a contrary view. The conviction in this regard which results from the general considerations of the text of the articles in the light of the statements made becomes irresistibly certain if the articles and their relation to each other are closely examined. Thus it is to be observed that while in France the duty to show the absence of good faith, which was one of the generating causes from which the doctrine of the personal character of the responsibility was deduced, was

expressed in a general provision of the Code Napoleon not
associated with the question of responsibility to return
fruits and revenues, in this instance that provision was
grouped in direct and immediate association with the
article under consideration as if to remove all possible
question of its application to the subject. Moreover, the
careful manner in which the article expresses the distinc-
tion between the liability of the heir as heir to return
fruits and revenues during the possession by the ancestor
in bad faith and the want of liability to return such rev-
enues during the period of possession by the heir in good.
faith serves palpably to emphasize the dissociation between
the continuity of heirship and the break in the continuity
of possession for the purpose of the return of fruits and
revenues lying at the basis of the doctrine of the personal
character of the question of good faith which came to be
established under the Code Napoleon.

And this view of the meaning of the text and of its pur-
pose and intent makes clear that it would be impossible
to adopt the interpretation stated in the Commentaries
of Scaevola to which we have previously referred. We
say this because that interpretation rests upon the exist-
ence of an assumed presumption of an examination by
an heir of the title deeds of his ancestor or author which
cannot be indulged in without disregarding the rule as to
burden of proof which Article 434 (§ 437 of the Porto
Rican Code) directly ordains. Besides when it is consid-
ered that the interpretation referred to makes the heir
in good faith liable to return fruits and revenues because
of the bad faith of the ancestor only in cases where an
assumed presumption of an examination of the title papers
of an ancestor by an heir would apply, it would follow not
only that the burden of proof fixed by the statute would
be disregarded, but that the interpretation relied upon
would be inapplicable where the bad faith of the ancestor
arose from conditions dehors his title papers and which

were not susceptible of being disclosed by an examination.

As under the provisions of § 444 of the Porto Rican Code when rightly interpreted, in the absence of proof of the bad faith of the defendants they were not liable for the return of the fruits and revenues during the period of their possession even although the bad faith of Mourraille, their author, had been established during the period of his possession, it follows that there was error in the refusal of the court below to so instruct the jury and hence a reversal must result and a new trial follow. Before, however, so directing, we observe that we are of opinion that the contention concerning the want of right of the plaintiff to recover rents and revenues of the property sued for for the period of his minority because of the administrative authority vested by law in his mother, under the circumstances here disclosed was without merit, and that such also is the case concerning the objection made to the admissibility of testimony concerning the quantum of fruits and revenues because of its speculative character. The judgment therefore will be reversed and the case remanded for further proceedings in conformity with this opinion.

*Reversed.*