ROSA PÉREZ CASALDUC ET AL., Plaintiffs and Appellees, v. MANUEL DÍAZ MEDIAVILLA ET AL., Defendants and Appellants.*

No. 4621. Argued May 29, 1929.—Decided July 18, 1930.

* NOTE.—On appeal to the U. S. Circuit Court of Appeals for the First Circuit, this decision was reversed. See 54 F. (2d.) 588; cert. den., 285 U. S. 557.

346

 

*Francisco Parra* for Díaz-Mediavilla spouses, appellants. *José R. Aponte* for the Federal Land Bank, appellant. *E. Pérez Casalduc* pro se, appellee; and *M. García Méndez* for other appellees.

MR. JUSTICE WOLF delivered the opinion of the Court.

In July, 1902, when the new Civil Code went into effect, the family council was suppressed and the district court substituted. In March of that year a family council met and by way of a supposed compromise authorized the transfer of infants' property in payment of debts. While the Chief Justice and Mr. Justice Hutchison are rather inclined to agree with the viewpoint of the court below, namely, that such suppression prevented a sale by the tutor without the consent of the court, the writer agrees with the appellants that if in March, 1902, such a family council had the power to authorize the transfer, the fact that the deed was made in October when the family council by the codes had been stripped of its powers could make no difference. The authority given a tutor to convey, compromise or what not was continued and was not revoked by the change of system. The situation is no different, the writer thinks, than when authority to sell is obtained from a court which is subsequently succeeded by another for the same district. The power given to the tutor was not, as maintained by the appellees, an adjective one, but was substantive. Hence the new code did not retroact. We shall not stop to examine the authorities cited pro and con by the parties.

The ancestor of the appellees, as was not unnatural, owed money at the time of his death. The recorded deed shows that an attachment or attachments existed against the said ancestor. Under these circumstances the family council met and by way of recited compromise authorized the tutor of certain minors to convey to one of the co-heirs certain real estate inherited by the minors. By the codes in March, 1902,

to alienate the real estate of a minor a public sale was necessary. The appellants cite authorities to the effect, nevertheless, that a tutor at least at that time might have made compromises of claims against the minors. We have the idea that a settlement of an attachment could not be called a compromise. Section 1711 of the Civil Code, reproduction of section 1809 of the Spanish Civil Code, provides:

"A compromise is a contract by which each of the parties in interest, by giving, promising, or retaining something, avoids the provocation of a suit, or terminates one that has already been instituted."

A reading of this section shows that not only must the avoidance or the termination of a suit exist, but that each of the parties give, promise or retain something. We understand this to mean, as follows from the general meaning of the word "compromise," that the creditor abates something of his claim. If the transfer pays in full the principal claim of the suit and dissolves the attachment, there is no compromise.

The appellees quote from the decision of the *Dirección General de los Registros* of December 26, 1893, to the effect that any technical right would not depend upon the name that the parties chose to give but to its essential nature. Hence, in this case, the fact that the parties dubbed their contract as one in compromise could not make it so. The appellees further cite from Manresa, vol. 12, page 96, that a compromise presupposes the existence of a right which has been discussed or is capable of being so; second, that the parties with the intention aforesaid (the prevention or the settlement of a suit) make mutual concessions equal or unequal in value. The appellees further in essence point out that the payment of what the other party demands is not a compromise.

In the present case claims of creditors existed and to settle them the tutor, with the consent of the family council,

made a *dation en paiement*. We do not find in the record that the creditors abated a single cent of their claims. The registry of property showed no such abatement nor some of the necessary elements set forth in section 1711, *supra*. It is a fair probability that the land actually conveyed was worth more than the claim. If this contract could be called a compromise, then any alienation in payment of mortgages and attachments could similarly be so called. If, for example, an unjust suit was filed against the ancestor which he was resisting and the plaintiff therein had attached his property, the mere existence of this unjust attachment would authorize a tutor to alienate a vast property of the ancestor without a public sale. Under our modern system the necessity of a public sale must be shown to the court. *A fortiori,* the alienation of minors' property at any time should be justified by the existence of something more than a nominal attachment. The nature of such attachment and the fact that what is familiarly known as a compromise took place, should be definitely shown. If transactions of the sort here sought to be exercised are tolerated, then the facts for their existence should be brought out clearly. Adjudications made in payment of debts are alienations. 87 *Jurisprudencia Civil* 11; *Longpré* v. *Díaz,* 237 U. S. 512; *Acosta* v. *Registrar,* 29 P. R.R. 8; *Del Rosario et al.* v. *Rucabado et al.,* 22 P.R.R. 438; *Rivera* v. *Registrar,* 30 P.R.R. 815; *Pagán et al.* v. *Sellés et al.,* 29 P.R.R. 764; *González et al.* v. *Díaz et al.,* 33 P.R.R. 172, all cited by the court below.

In this case, however, we have another conviction. Assuming in the tutor the power to compromise, we hold that such power does not extend to a sale of real estate without a public auction. The compromise is one thing; the actual sale is another. All sorts of compromises may be made without having a transfer of lands as one of the constituent elements. After a compromise was actually agreed upon, if it involved the alienation of minors' property, a public sale was necessary. We see no exception to this rule

in the authority of the tutor to make compromises. Section 272 of the Spanish Civil Code provided:

"The sale of real property, rights subject to record, jewelry or personal property, the value of which is over 4,000 pesetas, shall be made at public auction with the intervention of the guardian or protutor."

The cases of *Acosta* v. *Registrar of Arecibo*, and *Rivera* v. *Registrar of Arecibo*, *supra*, have some application to all of the foregoing reasoning.

Perhaps the principal doubt that this court has had over the case turns upon the question of whether the various appellants were third persons, and hence, whether the defects appeared or resulted clearly from the registry. Section 33 of the Mortgage Law provides:

"Instruments or contracts which are null under the law are not validated by their admission to record."

The appellants can find no comfort in the various records made subsequently to the original record transferring the interest of the minors. If a certain conveyance is void and the purchaser acquires no right under it, a half-a-dozen subsequent conveyances do not operate to make a defect less apparent. To each of the conveyances section 33 necessarily extends. A void act can not be made valid by subsequent conveyances.

Section 34 of the Mortgage Law provides:

"Notwithstanding the provisions of the foregoing article, instruments or contracts executed or entered into by a person who, according to the registry, has a right to do so, shall not be invalidated with regard to third persons after they have been recorded, even though the interest of such party should subsequently be annulled or terminated by virtue of a prior deed which was not recorded or for reasons which do not clearly appear from said registry.

"Only by virtue of a recorded instrument may another later instrument, also recorded, be invalidated to the prejudice of a third person, with the exceptions mentioned in article 389.

"The provisions of this article shall at no time apply to an instrument recorded in accordance with the provisions of article 390, unless prescription has validated and assured the interest to which said instrument refers."

Sometimes it would appear that the appellants are almost contending that a defect should positively appear in the registry; in other words, that it should be a patent and not a latent defect. For example, the registrar receives two conveyances, one from A to B and another from B to C, and he mistakenly merely records the conveyance from B to C in the registry, there would be nothing defective in the conveyance from B to C and yet no one who bought from C would claim any rights because of the lack of transfer from A to B. Yet, in the registry nothing would appear that was positively defective. The defect would be something lacking in the registry. Hence, if a public sale was necessary for the alienation of minors' property at the time of the existence of the family council, the fact that the registrar recorded the deed with the authority of the family council would not cure the defect. The lack of due authorization would similarly result from the registry, even if it did not clearly appear therefrom. Nothing illustrates the difference better than the case of *Ayllón et al.* v. *González et al.*, 28 P.R.R. 61. There we held that when a court acted it could be presumed that a tutor had complied with the necessity of giving a bond, etc., because it will be presumed that the court did not act unless the tutor had complied with the law and hence, that no defect appeared from the registry. In the present case there could be no possible presumption that there had been a public sale, because the fact was clearly otherwise, as seems to be conceded.

As decided by the court below, the proof of the defendants showed that the deed in question, " 'recorded more extensively in the fifth inscription of property No. 3210, at page 12 *et seq.* of this volume,' " was mentioned in the following form: " 'The said parties . . . . (describing the adults)

and the said minors Pérez y Casalduc, represented by their tutor Felipe Casalduc Colón, adult, widower, proprietor and resident of the said city of Utuado, by reason of an authorization which to that effect was conceded to him by the family council for the said minors, according to the report of the meeting held on the 24th of last March, do declare that they have compromised the differences with the creditors of the ancestor Eusebio Pérez Castillo, agreeing to convey to them in payment of their credits this property and another piece of property attached by them, with the condition that the *dation en paiement* of the rights which the said creditors have to both properties be made to José Antonio Pérez Rivera, who will be under the obligation of paying the debts with interest and costs, giving a value of thirty thousand dollars to the property under conveyance, and of four thousand six hundred dollars to the property called Hornos, which amounts to a total of thirty-four thousand six hundred dollars; and to carry into effect the agreement they give in payment by way of transaction to the said José Antonio Pérez y Rivera the said two pieces of property for the price indicated of thirty-four thousand six hundred dollars, in order that with that amount he should be reimbursed for the sums paid out by him on account of the grantors and those that still might be collected, which properties appear to be affected (*aseguradas*) by a mortgage and attachments existing upon them, including interest and costs,' " etc.

As the appellees point out, it clearly appeared that at the time of this record two of the grantors were minors under tutorship, that the property was transmitted to Antonio Pérez Rivera to pay certain amounts which had been secured to the creditors of the ancestor Eusebio Pérez Castillo, so that it appeared from the registry itself that the deed was made to pay certain hereditary debts and in accordance with section 996 of the Revised Civil Code again a public sale was necessary. We have already referred to section 272 of the Spanish Civil Code. Also, if a person buying from José

Antonio Pérez Rivera would inspect the record with a little
more care, he would find confirmation of the fact already
sufficiently indicated that the sale was made only with the
consent of the family council and not by virtue of any public
auction.

We think that the lack of a public sale sufficiently ap-
peared from the registry, and the judgment appealed from
should be affirmed.

Mr. Justice Texidor, dissenting.

I dissent from the opinion of the majority, because I
understand that in the present case the alienation of the
property in question was carried out by virtue of a com-
promise, and that once said compromise was authorized by
the family council of the minors, a public auction was not
necessary, nor as a general rule may in this kind of com-
promises a public auction be had.

Among the properties left by Eusebio Pérez Castillo and
Monserrate Rivera there were two pieces of rural property
known as "Santa Bárbara" and "Hornos", the former
situated in the ward of Jayuya Arriba and the latter in
Jayuya Abajo, in the Municipality of Utuado. These prop-
erties passed, by inheritance, to the children of Eusebio Pérez
and Monserrate Rivera, named Pablo, Josefa, Asunción,
Eusebio, José Antonio, Emilia, and Monserrate Pérez Rivera,
and to their grandchildren, infants, Rosa, Monserrate-
Rafaela, Rafaela-Monserrate, Eduardo, and Soledad Pérez
Casalduc.

The aforesaid minors were subject to the guardianship
of Felipe Casalduc Colón, assisted by a family council
which was an institution of the old Spanish Civil Code, in
force in Puerto Rico till July 1, 1902, on which date the
present Civil Code of Puerto Rico became effective. The
family council had faculties and powers like those had at
present by the district courts in so far as guardianship was
concerned. Among them, the necessary authority to com-

promise and submit to arbitration the questions in which the minor or incapacitated person might be interested. Paragraph 12, section 269, Spanish Civil Code.

These facts are established in accordance with the certificate from the registry of property and with the minutes of the family council of the minors Rosa, Monserrate-Rafaela, Eduardo, Rafaela-Monserrate, and Soledad Pérez Casalduc, quoted in a deed.

On March 24, 1902, a meeting of the family council was held and a motion of the tutor was submitted, requesting authorization to compromise certain pending suits brought against the succession of Eusebio Pérez and Monserrate Rivera, of which his wards formed part. The tutor expressed the necessity of avoiding additional expenses and costs, and the risk that the property attached be sold at public auction and that, given the financial crisis prevailing, good prices could not be obtained therefor at such auction, the credits remaining thus uncovered and the executed debtors in worse position than they were before; he further stated that the suits pending ought to be compromised with the consent of the heirs of full age, giving in payment the property attached, and among them the properties known as "Santa Bárbara" and "Hornos", the first of which was encumbered by an attachment for an enormous sum of money and the second by a mortgage and an attachment, for a considerable amount. He alleged besides that six of the heirs had agreed to grant or to give in payment of several debts judicially claimed to the heir José Antonio Pérez Rivera, the rights belonging to them in the "Santa Bárbara" and "Hornos" properties and that José Antonio Pérez Rivera covenanted to pay the sum of thirty-four thousand six hundred *pesos* to which the debts totalled, plus the interest and costs of which the properties encumbered by the mortgage and attachment had to answer, including in said sum whatever said gentleman had paid on account of other credits, to avoid a continuation of the attachments, said credits having

354

been endorsed to him; that he deemed it necessary and beneficial that the minors assigned their rights amounting to ⅛ of said properties.

The council heard the protutor who was of the opinion that the cession was useful and beneficial to the minors; and the council decided that, given the numerous suits brought against the succession and given the anomalous situation of the Island, the suits and questions should be compromised; and it authorized the tutor to grant or give in payment to José Antonio Pérez Rivera—to cover the part corresponding to the minors of the $34,600 encumbering said "Santa Bárbara" and "Hornos" properties—the undivided interest of said minors for a sum equal to that which the assignee agreed to pay to the creditors, assessing the first property in $30,000 and the second in $4,600.

In the registry of property there appeared on the "Santa Bárbara" property seven attachments, as shown by the fifth entry of said property (pages 46 to 48, transcript of evidence), and on the "Hornos" property a mortgage in favor of Banco Español de Puerto Rico for thirty-one thousand five-hundred thirty-seven *pesos* and twenty-seven cents, old provincial money, with interest at the rate of 8½ per cent per annum, plus two thousand *pesos* for costs and disbursements. (Fifth entry of said property, pages 54, 55, and 56 of the transcript of evidence.) In addition an attachment (pages 56, 57, and 58, transcript of evidence) levied by Banco Español de Puerto Rico in a suit against the estate of Eusebio Pérez for $6,922.36, plus $1,500 for interest and $250 for costs, proceeding from a mortgage loan, the writ of attachment being dated December 27, 1901.

Under those conditions was executed deed of compromise No. 91 of October 8, 1902, before Notary Felipe Casalduc Goicoechea, whereby, on the one side, Pablo, Eusebio, Josefa, Emilia, and Monserrate Pérez y Rivera and Felipe Casalduc Colón, as tutor of the minor children of Eduardo Pérez Rivera—Rosa, Monserrate-Rafaela, Ra-

faela-Monserrate, Eduardo, and Soledad Pérez Casalduc—
and showing his authorization by means of a certified copy
of the minutes of the meeting of the family council to which
we have already made reference, awarded by way of com-
promise to José Antonio Pérez Rivera the "Santa Bárbara"
and "Hornos" properties in order to cover with the value
thereof the amounts disbursed by him in payment of credits
against the succession of Eusebio Pérez and Monserrate
Rivera, as well as the pending credits secured by mortgage
and attachment over the said two properties, including in-
terest and costs; and José Antonio Pérez Rivera accepted
the contract, covenanting to present receipts signed by the
creditors for their credits, interest and costs.

The properties being thus awarded to José Antonio Pérez
and recorded in his favor in the registry of property as a
compromise, it is unnecessary to follow in detail the sub-
sequent transfers thereof. Suffice it to state that the mort-
gage credit constituted in favor of Banco Español de Puerto
Rico, together with another credit constituted by José
Antonio Pérez Rivera, was the object of another judicial
claim brought by the creditor against said Pérez Rivera and
that, once judgment was rendered against him, the prop-
erties were sold at public auction and awarded to the
creditor, the bank, who recorded the same in its name. The
bank sold the properties to Luciano Ortiz Antón, who re-
corded the sale in the registry of property, the mortgaged
property thus remaining in favor of the vendor for part of
the purchase price. Ortiz Antón and his wife sold the
"Hornos" property to Miguel de Ramery and the sale was
recorded. From said property two parcels were segregated;
one of 308 acres (cuerdas) and 56 hundredths and another of
84 acres and 84 hundredths; and the two parcels were sold
by Ramery to Francisco Parra Capó. The latter segregated
from the 308 acres a piece of 8 acres, which he sold; and
the other two properties were sold by him to Pedro Colón
and Rafael Arcelay and recorded as a property of 385 acres

and 40 hundredths; and this latter piece of property was sold by Colón and Arcelay to Manuel Díaz Mediavilla, who is now the principal defendant in the case at bar. Said property was mortgaged to the Federal Land Bank of Baltimore to secure the payment of a loan.

The complaint herein was based essentially on the grounds that the plaintiffs are owners of an undivided interest of ⅛ in the "Hornos" property, and that the alienation of the property to José Antonio Pérez Rivera never existed as a matter of law, inasmuch as it was not made with legal authority and at public auction.

The defendant Mediavilla alleged substantially that the alienation of the property to José Antonio Rivera was recorded in the Registry of Property of Arecibo in October 1902, by persons who appeared as owners in the registry, and that when the record was made in favor of José Antonio Pérez it was stated that the interested minors had had authorization from the family council to the tutor after complying with the legal requirements; that from the record it did not appear that the minors had any right or interest in the property or that they needed any judicial authorization; that the property had been alienated several times and the alienations recorded, till we come to the defendant, no defect appearing from the registry charging any one with notice that the minors had any right or interest in the property; and that the defendant, through his own possession and through that of his predecessors in interest, had possessed the property for over ten years, and that all the plaintiffs have always resided in Puerto Rico.

The Federal Land Bank of Baltimore answered similarly as Mediavilla did and alleged besides that it had obtained from the latter a mortgage over the property in question, in good faith and that its mortgage right was recorded in the registry.

The Civil Code of Puerto Rico became effective on July 1, 1902. This Code rejected the institution of the family council

which had theretofore existed under the Spanish Code. And the authorization for alienating or encumbering the property of minors or other incapacitated persons must now be granted by the courts.

Among the transitory provisions appearing at the end of our Civil Code we find the following:

"1. The rights originating under. the legislation previous to the revised Code from acts which took place while it was in force, shall be governed by the previous legislation even though the said Code regulates them in a different manner or does not recognize them. But if the rights shall appear and be declared for the first time in the revised Civil Code it shall have a prospective effect, even though the act which produces it shall take place under the previous legislation. Provided that it be not in conflict with or prejudicial to another right born or acquired through the operation of the said previous legislation.

"2. Acts and contracts entered into while the former legislation was in force and which are valid under it, shall have all their effects according to the same, without limitation of any kind."

The authority requested by the tutor from the family council for carrying out the compromise and for alienating the property was obtained on March 24, 1902, under the Spanish Civil Code then in force. It is unquestionable that it had such authority. The act of the family council in authorizing the tutor to make a compromise was absolutely valid; the tutor acquired all the legal authority he needed. The fact that another Civil Code became effective subsequently to such authorization, did not annul the same, inasmuch as the second transitory provision of the new Code, just quoted above, expressly established that the acts and contracts entered into while the former legislation was in force "shall have all their effects according to the same, without limitation of any kind." The expression "their effects according to the same," as referring to the former legislation, leads us to apply the old Code, which is the former legislation, and to investigate what effects the authorization produced in accordance therewith.

Section 269 of the Spanish Civil Code enumerated the cases in which the tutor needed authorization of the family council and subdivision 12 thereof provided:

"To compromise and submit to arbitration the questions in which the minor or incapacitated person may be interested."

The situation at the time the tutor appeared before the council was this:

(a) The minors under his guardianship had an undivided interest in the "Hornos" property.

(b) The "Hornos" property was subject to encumbrances and attachments, by reason of credits against the predecessors in interest of the succession, and later the succession itself.

(c) José Antonio Pérez Rivera had paid some of the credits against the succession.

(d) The creditors were entitled to follow and execute the properties, among them the "Hornos" property.

(e) The creditors were willing to deal with José Antonio Pérez Rivera regarding a settlement of the credits without executing the properties.

(f) The compromise avoided subsequent judicial proceedings, new costs and new disbursements.

We have no doubt that it was a compromise, by which contract the parties by giving, promising or retaining something avoid the provocation of a suit, or terminate one that has already been instituted. The creditors, on the one side, should have received payments; the other side, which in fact was the succession of Eusebio Pérez, received the discharge of its debts and the benefit of the new costs and disbursements, without further action on the part of the creditors. It does not matter what part José Antonio Pérez Rivera played. The credits in so far as the succession was concerned were extinguished; similarly as to the attachments and encumbrances and the personal responsibilities in case

the property encumbered or attached was not sufficient to cover the credits.

The real position of the minors with regard to this property should also be considered. Therein they had an undivided interest amounting to one-eighth. On this property and over another property there existed a mortgage which originally was for 31,437.26 *pesos*, old provincial money, which had been reduced on account of a payment or of several payments; and an attachment for $6,922.26 as principal, $1,500 as interest and $250 for costs, proceeding from the same mortgage credit. As appears from the registry the property was assessed at 40,000 *pesos* of the old provincial money, in accordance with the fifth entry thereof (pages 54, 55, 56, transcript of record) and subsequently—seventh entry (pages 58 and 59, transcript of record)—at $8,000. We note that apparently the share of the minors did not exceed the sum of $1,000; and their responsibility in the encumbrances was $1,000, at least.

We cannot see that a special award was made, of a certain part, to the minors; an interest on the property is all they had as a right thereon.

Under the conditions in which the succession was and given the state of the shares of the minors, which as an asset was problematic, inasmuch as the property was subject to an attachment like the one we have mentioned, the compromise recommended to the council and authorized by it—all the interested parties assigning their shares to one of the heirs who was to take charge of the settlement and payment of the credits—was a reasonable solution and perhaps the only one possible. A creditor had an attachment which was to be executed; and certainly such creditor would not enter into any deal subject to technical difficulties, when he had in his hands the recovery of his money on the property and the facility of proceeding against the remaining properties of his debtors for the unpaid balance of his credit.

The authorization was given to carry out a compromise.

And in order to enter into said contract, the shares which the heirs of Eusebio Pérez had in the "Hornos" and "Santa Barbara" properties, passed into the hands of José Antonio Pérez Rivera.

Under these conditions the deed of October 8, 1902, was executed and recorded in the Registry of Property of Arecibo.

Now we come to an examination of the question which we deem most important herein.

Sections 33 and 34 of our Mortgage Law read thus:

"33. Instruments or contracts which are null under the law are not validated by their admission to record."

"34. Notwithstanding the provisions of the foregoing article, instruments or contracts executed or entered into by a person who, according to the registry, has a right to do so, shall not be invalidated with regard to third persons after they have been recorded, even though the interest of such party should subsequently be annulled or terminated by virtue of a prior deed which was not recorded or for reasons which do not clearly appear from said registry.

"Only by virtue of a recorded instrument may another later instrument, also recorded, be invalidated to the prejudice of a third person, with the exceptions mentioned in article 389.

"The provisions of this article shall at no time apply to an instrument recorded in accordance with the provisions of article 390, unless prescription has validated and assured the interest to which said instrument refers."

Section 34 above quoted is one of the sections of said law most discussed and commented. It is evident that the circumstance that an act or an apparent contract is recorded, in violation of the law, can not make such an act or contract prevail as valid and perfect. But as the Mortgage Law is a law of security as regards third persons, and as for the recording of acts and contracts there are required certain strict requisites and the examination and qualification of documents by a registrar, who is an attorney and has power to deny the recording of void acts and contracts, value and effect must be given to a record already made, if it does not show on its face any defect avoiding the

.act or contract. If it does show it, the subsequent purchaser or grantee acquiring rights over the property so recorded, will have acquired something with knowledge of the existence of a cause of annulment, of which he had notice from the registry itself; whereas if the defect does not appear from the entry, such purchaser is thereby protected.

Does a cause of annulment apear from the original entry made in favor of José Antonio Pérez y Rivera? We are dealing here also with the question of whether, there being a compromise, a public auction was indispensable, and whether in fact there was an alienation when an undivided interest on a piece of property, encumbered to such an excess that its value would disappear under the encumbrance, is involved. So that the question may not easily be determined; it is a point of law which requires close study to be properly determined and decided. Section 34 does not simply speak of causes which do not appear from the registry but of causes which do not *clearly* appear therefrom. (Italics ours.) So an examination by an attorney specialized in Mortgage Law is not contemplated; but only that any person of average education may see whether or not the cause of nullity appears from the registry. The interpretation given by the jurisprudence is in accord with this theory. Thus in the case of *Ayllón y Ojeda et al.* v. *González y Fernández et al.*, 28 P.R.R. 61, 69, it was said:

"We understand section 33 to mean that a deed already void gains no strength by its record in the registry of property. In other words, if it is void or voidable it continues to remain so. Section 34, however, is one of the main sections of the Mortgage Law which protects the rights of third persons. One who buys from a person whose title is recorded in the registry of property is protected unless a defect clearly appears in the registry of property. People v. Riera, 27 P.R.R. 1; Sánchez v. Hartzell et al., 26 P.R.R. 620. The court below makes some point on the difference between the words 'appear' and 'result' as used in the said section. We think that the two words are synonymous for the purposes of this law and force

is given to this view by the fact that in the War Department translation the word '*resultar*' is translated 'appear'.''

That judgment was definitively affirmed by the Supreme Court of the United States in *B. Fernández & Bros.*, v. *Ayllón y Ojeda*, 266 U. S. 144, reversing a decision of the Circuit Court of Appeals for the First Circuit. Section 34 of the Mortgage Law of Puerto Rico was not explicitly discussed in the cited case but therein it was said:

'' . . . . The question is whether the defendants held their possessions under a 'just' or 'proper' title as it is called indifferently, within the meaning of the law that allows a ten-year prescription in that case in place of the thirty years for which a just title is not required. As remarked by the Puerto Rican Court a just title does not mean a perfect title, as otherwise prescription would not be needed. See United States v. Chandler–Dunbar Water Power Co., 209 U. S. 447, 450. If the title is good on its face and the possessor under it has no notice of any extrinsic defect, it will found a good title in ten years. The order of sale disclosed no defect, and the Supreme Court held that as it issued from a Court having jurisdiction over the minors and over the tutor, as we have said, the purchasers were not bound to look further. They had no actual notice of the omissions of the tutor, and for the purposes of a possession in good faith that would satisfy the law. They were entitled to assume that all necessary conditions had been fulfilled. We need not consider the further intimation of the Court, also to be respected, that the failure to register and to give bond did not make the sale void.''

We have deemed it useful to reproduce here the above excerpt from the opinion, in view of the intimate relationship existing between the doctrine of "just title" and the provisions of section 34 of the Mortgage Law.

In the case of *Pérez et al.* v. *Colom et al.*, 40 P.R.R. 380, this court said:

"The appellees answer by saying that the date of the adjudication did not appear in the registry itself, but only in the presentation or initial entry existing in the registry. We agree with the appellees and with the careful opinion of the court below that the

defect did not clearly appear from the registry. An intending purchaser is not bound to examine all the books thereof. The initial entry is of a temporary or volatile nature. It is the permanent record that counts. Purchasers of property in Puerto Rico have the right to assume that the registrar complied with his duty and recorded in his main books all that was necessary to transcribe. As bearing on the main proposition the following cases some of them cited by the court below may be reproduced: Vélez v. Camacho, 8 P.R.R. 35; People v. Riera, 27 P.R.R. 1; Ayllón v. González, 28 P.R.R. 61; Menéndez v. Cobb, 28 P.R.R. 725; Gutiérrez v. Pons, 32 P.R.R. 639; González v. Anglada, 33 P.R.R. 980.''

In the case of *Menéndez* v. *Cobb et al.*, 28 P.R.R. 725, 726, it was said:

''For the mere reason that the record of a forced sale does not show that the defendant owner of the property was duly summoned it can not be held that the third person knew that he was not summoned, for he may have been summoned although the record does not show it. Article 34 of the Mortgage Law categorically provides that the causes of nullity shall clearly appear from the registry; therefore the facts from which the nullity results must appear from the registry clearly and affirmatively.''

Following such doctrine and such reasoning it would be necessary that we should have seen that the causes of nullity resulted affirmatively and clearly from the registry itself, in order to decide the affirmance of the judgment appealed from, thereby declaring that successive purchasers of the property had legal notice of the existence of certain defects or causes of nullity. And in our opinion such causes do not appear affirmatively and clearly. And it was on the basis of an entry in the registry wherefrom the causes of nullity do not appear affirmatively and clearly, that the subsequent purchases were made and the property was possessed for a great number of years by successive purchasers, in good faith, without the alleged co-owners of the property making any claim against the possessors.

The Supreme Court of Spain in its judgment rendered November 25, 1890, in the case of Ramón Valdés against

the Municipality of Oviedo, vol. 68, Civil Jurisprudence, pages 426 to 432, decided that:

" . . . . The legal principle regarding the fact that what is void *ab initio* can not be made good by the lapse of time, is not unlimited or absolute, and should be understood applicable only, as the Supreme Court has declared, when the law, given certain circumstances, does not recognize or create a right to be respected.''

The defendant Mediavilla and his wife, have purchased from a person who in the registry of property appeared as owner, having the right or title to sell and to alienate, no cause of nullity resulting clearly and affirmatively from the entries in the registry. They possessed with just title, quietly and peaceably as owners, and in good faith, for over ten years, within which time it appears that the plaintiffs herein lived in Puerto Rico and during which the plaintiffs have filed no judicial or extrajudicial claim. It is unnecessary to cite herein all the cases wherein we have declared what a just title is. It will suffice to invoke the decision of the Supreme Court of the United States in the case of *B. Fernández & Bros.* v. *Ayllón y Ojeda, supra,* confirming the declaration of what constitutes a just title made by this court in the sense that it does not mean a perfect title; and that if it is valid on its face and the possessor has no notice of an extrinsic defect, it will sustain a valid title after ten years.

In the case of *Martorell et al.* v. *J. Ochoa & Hermano,* 25 P.R.R. 707, 711, 713, it was said by this court:

"As regards color of title, section 1853 expressly provides that it is understood to be that which legally suffices to transfer the ownership or property right, the prescription of which is in question. In order that the title may be colorable it is not necessary that it actually transfers the ownership or property right, but that it is sufficient to transfer it *although it may contain a defect which invalidates it.* And this is necessarily so, because if under the name of color of title, which the law requires for prescription, is meant only a title clothed with all the internal and external requisites

necessary for the real and actual transfer of ownership, prescription would be superfluous as a means of acquiring ownership.

"Later, in a judgment of November 30, 1910, the same court held that 'even supposing that a deed could not have transferred to the vendee the ownership of the property claimed because of the nullity of the title asserted by the vendor, if the said deed, besides, containing in form the requirements of the law, constitutes by its nature a title conveying ownership, it is manifest that it fulfills the conditions of articles 1952 and 1953 of the Civil Code (secs. 1853 and 1854 of the Rev. Civ. Code), as held by this court in similar cases; because, if it were required that the said deed should convey to the purchaser in fact and in law the ownership of the property, there would be no need for him to resort to prescription, and this mode of acquisition, in so far as regards ordinary prescription, would be superfluous and would have to be eliminated from the methods of acquiring title under our statutes as unnecessary and useless.' 119 Civ. Jur. 486.''

In the same decision of *Martorell* v. *Ochoa, supra,* mention is made of the term "good faith", as follows:

"Section 1851 defines good faith as consisting in the belief that the person from whom the possessor received the thing was the owner of the same and could convey his title. Such belief is sufficient to establish good faith, and it is not necessary that the grantor should be the real and absolute owner thereof and could pass title of ownership. This definition of good faith is in harmony with that of sections 436 and 437, which are made applicable to prescription by the express provision of section 1852; and section 436 provides that a bona fide possessor is deemed to be the person who is not aware that there exists in his title, or in the manner of acquiring it, any flaw invalidating the same, and that a possessor in bad faith is deemed to be any person possessing in any contrary case. According to section 437, good faith is always presumed and any person averring bad faith on the part of a possessor is bound to prove the same. Therefore a person who believes that he acquired the property from one who was the owner of it and capable of transferring its ownership, or a person who is not aware that there exists in his title, or in the manner of acquiring it, any flaw invalidating the same, is a bona fide possessor. Consequently, good faith is com-

patible with a title invalidated by a defect, provided the possessor is not aware of the existence of such defect or believes that it does not exist.''

Said property having been acquired in the manner we have stated, and it having been possessed by successive purchasers uninterruptedly for over 10 years as to persons present, tacking to the possession of the present occupant that of the predecessors in title, we are of the opinion that the prescription provided by sections 1831, 1841, 1842, 1851, 1853, 1854 and 1858 of the Civil Code of Puerto Rico protects the defendants. As regards the time of the prescription, section 1861 of the same code may be cited.

For the foregoing reasons, we are of the opinion that the judgment appealed from should be reversed and that another judgment should be entered dismissing the complaint.

I am authorized to state that Mr. Justice Aldrey concurs in this opinion.